Dorthy M. THOMPSON, et al., Plaintiffs,

v.

William J. BARRETT, Jr., Defendant.

Civ. A. No. 74–1101.

United States District Court, District of Columbia.

Dec. 19, 1984.

Norah A. Bailey of Ivins, Phillips & Barker, David M. Dorsen of Sachs, Greenebaum & Taylor, Roger Warin of Steptoe & Johnson, and Roderic V.O. Boggs of the Washington Lawyers' Committee For Civil Rights Under Law, Washington, D.C., for plaintiffs.

Joseph E. diGenova, U.S. Atty., Royce C. Lamberth and Robert C. Seldon, Asst. U.S. Attys., Washington, D.C., for defendant.

## OPINION

CHARLES R. RICHEY, District Judge.

### INTRODUCTION

This case is before the Court on Plaintiff's Application for an Award of Attorneys' Fees and Costs, arising out of plaintiffs' successful suit brought against the defendant under Title VII of the Civil Rights Act of 1964 and the Equal Pay Act. Litigation in this case has gone on for almost twelve years. The case has survived the death of the original trial judge, whose untimely death occurred before decision, and thus required a second trial, and an appeal to the District of Columbia Circuit. *Thompson v. Sawyer*, 678 F.2d 257 (D.C.Cir.1982). One of the major claims in this action was initially dismissed by the original trial judge, then reinstated for the second trial by this Court. Major precedents were set in several areas of the Civil Rights Laws, which offered the plaintiffs at most an unclear basis for relief at the time this litigation commenced. The litigation resulted in a major breakthrough for women in the government printing field, and in the general area of equal pay for equal work. Major newspaper and magazine articles in such publications as the Washington Post, Ms. Magazine and Good Housekeeping, etc., as well as reports in the national media such as the NBC Nightly News, which are in the record of this fee application, proclaimed the case as a landmark in the protection of womens' rights in the workplace. They also chronicled the risks involved, as well as the magnitude of the changes in the printing and other industries resulting from this case. The Washington Post, May 21, 1980, at A1, col. 1; N.Y. Times, May 21, 1980, at A20, col. 1; Good Housekeeping, April, 1984, pg. 84. In every respect, this case represents an outstanding example of tenacious advocacy, the making of new law, and doing so in the face of extreme odds and in the finest tradition of legal advocacy at its very best.

### HISTORY OF THE CASE

The underlying action commenced on May 25, 1973 when five females filed an

administrative complaint on behalf of approximately 325 Journeyman Bindery Workers ("JBWs") employed in the Bindery Division of the Government Printing Office ("GPO"). The Complaint alleged Title VII and Equal Pay Act violations and Title VII access violations. The complaint sought reclassification of all JBWs as Bookbinders with pay commensurate with that reclassification, and monetary and injunctive relief based on the illegal and discriminatory imposition of impediments to JBWs' becoming Bookbinders.

After a lengthy administrative investigation, the GPO denied plaintiffs' claims in their entirety, finding that the JBWs were not victims of sex discrimination. Plaintiffs were denied the opportunity to discuss the findings in the administrative record.

On July 24, 1974, plaintiffs filed a class action in this Court, which was assigned to the late Judge Joseph Waddy. The complaint relied, *inter alia,* on Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–16; the Equal Pay Act of 1963, as amended, 29 U.S.C. § 206(d); and Executive Order 11478, 34 F.R. 12985, as amended. The complaint alleged a broad pattern and practice of discrimination on the part of GPO extending to all class plaintiffs, and sought injunctive, declaratory and monetary relief, both retrospective and prospective.

The case went to trial before Judge Waddy in March, 1978. At the close of plaintiffs' case, he granted Summary Judgment in favor of the government on the plaintiffs' Equal Pay Act claims. The trial was then tried to a conclusion without a decision being rendered because Judge Waddy died in the following summer, before making the requisite findings under Title VII of the Civil Rights Act of 1964, as amended. The case was thereupon randomly reassigned to this member of the Court. The Court, after careful consideration, determined that plaintiffs were entitled to a new trial on all issues. Following further discovery and proceedings before the Court, a second trial began on March 7, 1979.

On October 1, 1979, the Court issued a memorandum opinion on the issue of liability. In that opinion, the Court held that Grade 4 JBW plaintiffs who operated Smyth Sewing Machines were entitled to relief under the Equal Pay Act, and that all plaintiffs were entitled to relief under Title VII on the grounds, among others, that the four-year apprenticeship program was unnecessary and itself constituted a violation of Title VII as applied to the plaintiffs, and that the classification of all plaintiffs differently from Bookbinders also was a violation of Title VII.

On May 20, 1980, the Court issued a relief order, together with a supporting memorandum. Among the provisions of the order were that the plaintiffs were entitled to back-pay relief under Equal Pay Act and Title VII prior to the effective date of those statutes and that plaintiffs were entitled to hiring preferences over males until fifty percent (50%) were women, and other prospective relief.

GPO thereupon filed an appeal and plaintiffs cross-appealed. On April 27, 1982, the Court of Appeals for the District of Columbia Circuit affirmed this Court's decision in almost every respect. *Thompson v. Sawyer,* 678 F.2d 257 (D.C.Cir.1982). The Circuit Court issued a narrow remand confined to refashioning the quotas or goals established by this Court, and for revising the formula for front pay to make it consistent with the formula used for awarding back pay for Title VII access violations. On June 11, 1982, GPO petitioned for an extension of time in which to file a petition for rehearing. This motion was denied by the Court of Appeals. GPO did not seek *certiorari* review by the Supreme Court.

## THE FEE PETITION

Plaintiffs' attorneys, Nora A. Bailey of Ivins, Phillips & Barker, Roderic V.O. Boggs of the Washington Lawyers Committee for Civil Rights Under Law, and David M. Dorsen of Sachs, Greenebaum & Tayler, have filed the present application for an award of attorney's fees and costs through June 25, 1982. The original appli-

cation has been supplemented four times in light of strong opposition by the defendant and changes in the law affecting this matter. Plaintiffs' attorneys base their application on Section 717 of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–16, 29 C.F.R. § 1613.271(c), and the Equal Pay Act, as amended, 29 U.S.C. § 216(b).

■ As there can be no question that plaintiffs are the prevailing party in this action, they are entitled to an award of reasonable fees and costs under both of the above-cited statutes. The crucial determination, as in any attorneys' fees dispute, is the proper amount to which plaintiffs are entitled under the law. 42 U.S.C. § 2000e–16 establishes a procedure whereby federal employees may bring a Title VII suit against the government. 42 U.S.C. § 2000e–16(d) provides that civil actions brought under this statute will be governed by § 2000e–5(f) through (k). Under these provisions, a prevailing party in a Title VII claim, other than the Equal Opportunity Commission or the United States, may, in the discretion of the trial court, be awarded reasonable attorneys' fees from the government. 42 U.S.C. § 2000e–5(k). Likewise, 29 U.S.C. § 216(b) provides for reasonable attorneys' fees in a successful Equal Pay Act claim.

■ As the Supreme Court has recognized, the amount which reflects a "reasonable" attorneys' fee must be determined on the facts of each case. *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 1937, 76 L.Ed.2d 40 (1983). In that case the Supreme Court embraced the "loadstar" formula: the number of hours reasonably expended multiplied by a reasonable hourly rate. *Id.* 103 S.Ct. at 1940; *Copeland v. Marshall,* 641 F.2d 880, 891 (D.C.Cir.1980). As the Court said in *Hensley,* "[t]his calculation provides an objective basis by which to make an initial estimate of the value of a lawyer's services." 103 S.Ct. at 1939. The product of this formula can then be adjusted upward or downward based on other considerations, including the degree to which the plaintiff has prevailed on all the issues raised. *Id.* 103 S.Ct. at 1940. After such an adjustment has been made, the resulting amount may then be increased by the use of a "multiplier," or "incentive award," which increases the total award to reflect an exceptional success obtained, or a substantial risk involved in the litigation. *Blum v. Stetson,* — U.S. —, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). Certainly, there was not only exceptional success, but also a substantial risk involved from the outset of this case to its conclusion.

## I. THE HOURS WORKED BY PLAINTIFFS' ATTORNEYS WERE REASONABLE.

■ The starting point in the "loadstar" analysis is a determination of the number of hours reasonable worked by the attorneys representing the prevailing party. Hours reasonably worked are not always the same as hours actually worked, however. *Copeland v. Marshall, supra* at 891. Hours spent on unnecessary or duplicative work must be subtracted from the total number of hours claimed. Likewise, hours spent preparing for and litigating an unsuccessful claim which is "truly fractionable" from the successful claims are to be deducted. *Id.* at 892 n. 18, *Citing, Lamphere v. Brown University,* 610 F.2d 46, 47 (1st Cir.1979). The defendant in the present case argues that the total number of hours claimed by the plaintiffs' attorneys must be decreased due to what it sees as substantial blocks of nonproductive time. In addition, the defendant asks that the Court further decrease the total number of hours claimed by the amount of time spent on claims on which the defendant feels it, rather than the plaintiffs, prevailed. For the reasons following, the Court finds the total number of hours claimed to be reasonable in light of the facts of this case. *Hensley, supra* 103 S.Ct. at 1937.

a) The hours claimed for the appeal are not duplicative, unnecessary or nonproductive.

■ The plaintiffs' attorneys have claimed a total of 7649.75 hours spent liti-

gating this case over the course of nearly twelve years. If taken out of context, this number could appear extraordinary. However, within the facts of this case the sheer size of the hours claimed is not by itself enough to justify a reduction. The defendants have termed the hours claimed as extravagant and wasteful, yet they · have failed to produce any evidence which supports their position. Specifically, they focus on the time claimed for work done on the appeal to the District of Columbia Circuit, the Court of Appeals remand, and the time spent in preparation for and litigation of the two trials.

The government states that 1600 billable hours were spent solely to write plaintiffs' briefs and to prepare for and argue their case. This, they contend, is an excessive amount of time. The record in this case, however, fails to support the government's contentions. Initially, the hours billed from September 3, 1980 through September 29, 1981, the time period relevant to the appeal, reflect work done on all matters, not just the appeal. This included work on the government's request for a stay, and many communications with class-members regarding such issues as training and possible reprisals. In addition, the government miscalculates the total number of hours spent during this period by almost 200 hours.

Even so, the Court sees nothing excessive about 1600 hours spent over more than one year by counsel in this case. As the government itself has pointed out, this was no ordinary appeal. The issues were extremely complex and difficult. The government's opening and reply briefs were each 52 pages in length, the plaintiffs two briefs totalled 159 pages. Oral argument was set for 45 minutes, rather than the more customary 15 or 20 minutes. At stake was a judgment valued at more than $20 million. There existed a substantial risk of reversal on appeal demonstrated by the fact that at least one of the major issues had been adversely decided earlier by Judge Waddy. In light of the background of this case, and the risk of reversal on appeal, the Court finds that the hours spent on appeal were reasonable and not excessive or wasteful.

b) The narrow remand does not justify a reduction in the fee.

■ The government next claims that the plaintiffs should not be compensated for those parts of its appeal which were affected by the Court of Appeals remand. They base this contention on the holding in *Copeland* that "no compensation should be paid for time spent litigating claims upon which the party seeking the fee did not ultimately prevail." 641 F.2d at 891–92. The government, however, appears to have mistaken the meaning of this passage on which they rely. As the Court in *Copeland* explained in a footnote directly following the above quote:

> However, it sometimes will be the case that a lawsuit will seek recovery under a variety of legal theories complaining of essentially the same injury. A district judge must take care not to reduce a fee award arbitrarily simply because a plaintiff did not prevail under one or more of these legal theories. *No reduction in fee is appropriate where the "issue was all part and parcel of one matter," Lamphere v. Brown Univ.,* 610·F.2d 46, 47 (1st Cir.1979), *but only when the claims asserted are "truly fractionable," Id.* (emphasis supplied).

The idea that the Court should deduct only those hours worked on claims unrelated to the prevailing claim is supported by the decision in *Hensley v. Eckerhart, supra.* There, the Supreme Court held that a court's rejection of alternative arguments aimed at the same "ultimate result" should not result in a reduction of the fee. As the Court there stated, "[t]he result is what matters." *Id.* 103 S.Ct. at 1940. Indeed, that case also notes that it is not necessarily significant that the plaintiff did not receive all the relief requested, so long as the relief that was obtained justified the attorney hours expended. *Id.* 103 S.Ct. at 1941 n. 11. Here, the hours expended were reasonable.

This is not a case where the plaintiff has failed to prevail on a claim that is "distinct in all respects from his successful claim." *Thompson v. Sawyer*, 586 F.Supp. 635, 640 (D.D.C.1984); *Citing, Hensley v. Eckerhart, supra.* Plaintiffs in this case prevailed on every one of the claims of violations, although not every remedy they sought was awarded. They prevailed on all claims arising out of the same nucleus of operative fact. *Thompson v. Sawyer*, 586 F.Supp. at 641. As previously indicated, the decision of this Court was affirmed by the Court of Appeals, and remanded only for the narrow purpose of refashioning portions of the relief granted. *Thompson v. Sawyer*, 586 F.Supp. at 638 n. 2. Therefore, the Court will not reduce the total fee award on the basis of the narrow remand in this case.

c) The time spent preparing for the second trial was reasonable.

The defendant has contended that the time spent preparing for the two trials involved in this case was wasteful. It is argued that since both trials involved the same facts and issues, there was no reason to fully prepare for trial twice and, therefore, either the first effort was inadequate or the second effort was superfluous. If this was in fact the case, then the fee award should be reduced to eliminate such duplicative or inefficient work. *Copeland v. Marshall, supra* at 891. However, the Court finds such not to be the fact.

The defendant, however, once again fails to see the trees from the forest. Instead of looking at the specific needs of such a complex case as this, and the specific work performed by plaintiffs' attorneys, which the hours billed represent, the defendant merely points to the aggregate of the hours claimed and says that that is too much. The defendant again misreads the record. The 2051.5 hours claimed prior to the first trial involved much more than mere trial preparation. A cursory review of the time sheets submitted show considerable time spent on administrative proceedings, drafting the complaint, certifying

the class, drafting and arguing a summary judgment motion, joining the Equal Pay Act plaintiffs, answering plaintiff inquiries, dealing with harassment and grievances, settlement discussions, voluminous discovery efforts and problems, and finally, trial. It also involved complex expert testimony on the intricacies of the printing industry, bookbinding, the workplace at GPO and many other complex statistical matters. It is patently clear to the Court that with a case this size, the hours spent prior to the first trial were reasonable in light of the facts of the case. *Hensley v. Eckerhart, supra*, 103 S.Ct. at 1937.

The time spent before the second trial was equally reasonable. Again, this total of some 1474.5 hours reflects many other activities on the part of the plaintiffs' attorneys beyond mere trial preparation. Mr. Dorsen was brought in to act as lead counsel for the second trial, and for two months prior to the trial worked on all aspects of the case. It is not unreasonable that he would require a large amount of time in order to become familiar with the case and all its complexities. The Court will not reduce the total award solely on the basis of the aggregate total of hours, without a specific showing by the defendant as to why the time spent was wasteful or inefficient.

II. THE REASONABLE HOURLY RATE IS WHAT THE ATTORNEY BILLED FEE–PAYING CLIENTS AT THE TIME THE WORK WAS DONE, OR THE PREVAILING MARKET RATE IF THE ATTORNEY HAS NO BILLING HISTORY.

The second factor in the "loadstar" computation is a reasonable hourly rate. *Copeland v. Marshall, supra* at 893. This second factor has been the source of considerable confusion as courts have struggled with finding an effective method of determining what a "reasonable" rate should be. The guide throughout has been the intent of Congress when it passed the attorneys' fees statute. The purpose was to provide for a fee which would be "ade-

quate to attract competent counsel, but ... [that does] not produce windfalls to attorneys." *Blum v. Stetson, supra* 104 S.Ct. at 1548. Reasonable hourly rate was, therefore, tied into the court's determination of the "prevailing market rate." *Id.* With this Congressional purpose in mind, the Court of Appeals of this Circuit has several times allowed the prevailing market rate, and therefore the "reasonable" hourly rate, to be based on the hourly rate customarily charged by the attorney to fee-paying clients. *Copeland v. Marshall, supra; National Assoc. of Concerned Veterans v. Secty. of Defense,* 675 F.2d 1319 (D.C.Cir. 1982) (per curiam); *Murray v. Weinberger,* 741 F.2d 1423 (D.C.Cir.1984).

The culmination of this trend towards using an attorney's own billing history as the best measure of the prevailing market rates occurred recently in *Laffey v. Northwest Airlines, Inc.,* 746 F.2d 4 (D.C.Cir. 1984). That case clearly holds that the second factor of the loadstar equation should be the hourly rate charged by the attorney to fee-paying clients at the time the work was done. *Id.* at 41–43. Laffey directs only that the fee charged fall into the "bracket" of rates charged by other firms for similar work in the same community. *Id.* at 41. If the rate charged to fee-paying clients falls within the bracket, then that fee is presumptively the attorney's market rate, and, therefore, reasonable within the meaning of the loadstar formula. *Id.*

Following the decision in *Laffey,* the plaintiffs' counsel filed a Fourth Supplemental Memorandum which sought a considerable increase in the total award based on counsels' reading of the decision. Under the plaintiffs' interpretation of *Laffey,* a prevailing attorney would be able to multiply the number of hours reasonably worked by the rate which the attorney bills at the present time. Thus, Mrs. Bailey raised her requested fee from $135 pre-Laffey, to $195 an hour, the rate at which she customarily bills her fee-paying clients as of January 1, 1984. Likewise, Mr. Dorsen's rate jumped from $150 to $160 per hour to reflect a recent rise in his usual hourly rate. Each attorney interpreted *Laffey* as permitting them to bill *all* their hours spent on this case at the rate which they now bill other clients.

The Court, however, cannot agree with plaintiffs' interpretation. The Court of Appeals makes reference to use of the attorney's "current" hourly rate. *Laffey, supra* at 25 n. 86, *Citing, National Assoc. of Concerned Veterans, supra* at 1336.; *Murray v. Weinberger, supra* at 1428 n. 20. As the Court in *Laffey* points out, it "makes no sense to require a firm to document its own billing history and then totally ignore that history in setting the hourly rate." *Id.* Setting the hourly rate at what the attorney bills at the present time would defeat the Congressional intent as interpreted in *Blum,* by resulting in a windfall for attorneys who would be able to recover several times the rate they would normally have been able to charge a fee-paying client merely by the passage of time. This is precisely the reasoning used by the Court of Appeals in *Murray v. Weinberger,* 741 F.2d 1423 (D.C.Cir.1984), when that court stated that upon remand the district court "may consider whether the use of current market rates would produce a reasonable fee ... without generating a windfall for plaintiffs' attorneys." *Id.* at 1433.

As an example of this, the Court notes that Mrs. Bailey's hourly rate in 1973, when this litigation commenced, was $40 an hour. That $40 an hour reflected what Mrs. Bailey could command in the marketplace at that time, based on her then current skill, expertise and training. As the years passed, Mrs. Bailey's ability increased with the additional years of experience and the increase of her skills which such experience provides. Her hourly rate rose accordingly. In 1977 she billed at $90 an hour, in 1980 her rate had climbed to $145, and as of January of 1984, she charged $195 an hour, or nearly five times the rate she charged when this case began.

Each step along this ladder reflects the background, experience and expertise of

Mrs. Bailey at that particular point in time. Mr. Dorsen's fees also escalated in this manner. As the value of their services has increased over time, the rate each of these attorneys can command has risen correspondingly. This is precisely the market theory envisioned in *Blum, supra.*

It would be a windfall indeed if services performed almost twelve years ago, valued in the marketplace at $40 an hour, could now be reimbursed at nearly five times that amount for work done at that time. Even work done one year ago can only be valued at what the work was worth at the time the services were performed. Otherwise the result would be a great inequity as the non-prevailing party would be forced to pay many times over the actual value of services rendered based solely on the number of years required to bring a matter such as this to a conclusion. Such a result was clearly not foreseen by Congress, and was specifically rejected by the Supreme Court in *Blum.* Therefore, the Court finds that the reasonable hourly rate for Mrs. Bailey and Mr. Dorsen will be determined by what each charged fee-paying clients at the time each item of work was billed. The Court finds that the fees charged during the relevant periods fall within the "bracket" of rates charged by attorneys with similar backgrounds doing similar work within this community.

As for Mr. Boggs, the Court notes that the Court of Appeals in *Laffey* left the law regarding attorneys without billing histories unchanged. *Id.* at 18. For a public-interest attorney such as Mr. Boggs, the reasonable hourly rate is determined by reference to the prevailing community standard for attorneys of like background and experience doing similar work. *Blum v. Stetson, supra* 104 S.Ct. at 1547; *National Assoc. of Concerned Veterans, supra* at 1325. For an attorney with 11 to 19 years of experience, the reasonable rate has been found to be $150 an hour. *Laffey v. Northwest Airlines, Inc.,* 572 F.Supp. 354, 371 (D.D.C.1983). As Mr. Boggs falls into this category, the Court will adopt this finding for purposes of this case and set

Mr. Boggs' reasonable hourly rate accordingly.

Finally, there are several claims for work done by associates, para-legals and law clerks working in conjunction with the counsel in this case. As the defendant has failed to show why these hours should be seen as unreasonable, the Court will allow all such hours claimed. The rates to be applied are those rates set forth in the original petition which appear to be the rates at which such staff were customarily billed during the period the work was actually performed.

III. THE CIRCUMSTANCES OF THIS CASE JUSTIFY A 50% MULTIPLIER FOR SUBSTANTIAL RISK AND A FURTHER 25% MULTIPLIER FOR EXCEPTIONAL RESULTS OBTAINED.

Plaintiffs' counsel in this case seek two separate 50% upward adjustments to the loadstar amount. The first adjustment sought is a 50% increase for the exceptional risk involved in handling this case. The second 50% adjustment is sought for the exceptional result counsel were able to obtain. The Court fully agrees that some sort of multiplier is justified in this very exceptional case. However, the Court does not find that the full 100% increase sought by the prevailing counsel is called for. Rather, the Court finds, based on the facts of this case, that the multiplier to be applied should be 50% for risk and a further 25% for results obtained.

■ Initially, it must be noted that the case law in this area regards the loadstar as the presumptively reasonable fee to which the attorney is entitled. *Hensley v. Eckerhart, supra* 103 S.Ct. at 1940; *Murray v. Weinberger, supra* at 1428. In *Blum v. Stetson, supra,* the Supreme Court reaffirmed this principle, holding that only in exceptional circumstances will the loadstar be inadequate to fully compensate the attorneys under the meaning of the statute. *Id.* 104 S.Ct. at 1548. The Court there stated that it is "a rare case in which an upward adjustment to the pre-

sumptively reasonable fee of rate times hours is appropriate." *Id.* 104 S.Ct. at 1550. Thus there is a "heavy burden" on the prevailing attorneys to justify any upward adjustments. *Id.* This burden can only be met if the prevailing attorney makes a specific claim based on a particular factor and supported by specific evidence. *Murray v. Weinberger*, supra at 1429. *Accord, National Assoc. of Concerned Veterans*, *supra* at 1323. Concurrent with this burden is the duty of the district court to justify with particularity why an adjustment is needed to fully compensate the attorneys. *Blum v. Stetson, supra* at 104 S.Ct. 1548–50.

   a) A 50% upward adjustment for the substantial risk involved in bringing this suit is appropriate and necessary to fully compensate the prevailing attorneys.

■ The plaintiffs' attorneys are seeking a 50% multiplier for the risk they took that they might never be compensated for their labor. They submit, and the Court agrees, that this is truly an "exceptional case," frought with exceptional risks. As the Court of Appeals held in *Laffey*, "to the extent unusual circumstances exist, those exceptional circumstances are best taken into account in adjustments to the loadstar." *Id.* at 41. Although the Court in *Laffey* denied the upward adjustments, this case presents many exceptional factors not found in the record before the Court in that case.

First, in *Laffey*, the fact that the district court found that the initial chance of success was 50% was not "exceptional" enough to warrant any upward adjustment. *Laffey, supra* at 51. In this case, a cursory review of the statistics prepared by the Office of the United States Attorney for the District of Columbia in its annual report for 1978, the year this case initially went to trial, reveal that for all Title VII cases brought in the District of Columbia, the plaintiffs prevailed in only 12 out of the 63 cases which went to trial. Thus, a bare statistical analysis would give the plaintiffs

only a 19% chance of success even if it were the "typical" Title VII case. As previously noted, this was hardly the "typical" case. Thus the chances of success, statistically speaking, were much lower than even the 19% noted above.

Secondly, *Laffey* was decided by the district court three years after being brought. The judgment was affirmed in 1976. The remaining eight years were spent litigating the remedy issues. In the present case, it was a full *six* years after the action was brought until the district court's decision, largely because of the unfortunate death of Judge Waddy. The Court of Appeals affirmed in 1982, after the case had been pending for nine years. Further, in the first five years of this litigation, the plaintiffs had lost both before the GPO and, at least on one of their major claims, before Judge Waddy. Thus, two different forums had found some of the claims to be meritless in the first five of the nearly twelve years this case has taken. This case was at risk substantially longer than was the case in *Laffey*.

Finally, the Court finds that the best reflection of the amount of risk facing plaintiffs at the outset of this litigation is the state of the law as it existed in 1973, when this litigation began. At that time major legal questions were undecided regarding both Title VII and the Equal Pay Act. Examples of some of these decisive but unanswered issues at that time include: 1) whether a federal employee could maintain a class action; 2) whether the class could obtain a trial *de novo* in the district court; 3) whether the Equal Pay Act would be applicable to the federal government; 4) whether there could be a violation of the Equal Pay Act when males and females operated different machines; 5) whether Title VII and the Equal Pay Act applied retroactively; and 6) whether this circuit, or the Supreme Court, would hold that goals or quotas were appropriate remedies in discrimination cases. Thus, the law in this area was far from clear when the plaintiffs began, and they faced an enormous risk that one or several of these questions would be decided against them.

It is clear to this Court that the plaintiffs have met their burden of showing specific factors and specific evidence to support their request for an upward adjustment for the risk involved. Therefore, the Court will award, for the reasons above stated, a 50% upward adjustment based on the substantial risk which these attorneys overcame. Such a 50% increase for risk in a Title VII and Equal Pay Act action such as this finds support in the case law of this and other circuits. *Vaughn v. GPO*, No. 77–0787 (D.D.C. July 19, 1982) (75% increase for risk); *Rajender v. University of Minnesota*, 546 F.Supp. 158, 173 (D.Minn. 1982) (100% increase for risk); *Dickerson v. Pritchard*, 551 F.Supp. 306, 313 (D.C. Ark.1982), *aff'd*, 706 F.2d 256 (8th Cir.1983) (50% increase); *Keith v. Volpe*, 86 F.R.D. 565, 577 (C.D.Cal.1980) (250% increase for contingency and quality); *Wells v. Hutchinson*, 499 F.Supp. 174 (E.D.Tex.1980) (100% increase).

   b) The prevailing attorneys have met their burden regarding the award of an upward adjustment for exceptional results obtained, therefore the Court will increase the total award by 25%

    ■ Plaintiffs' second requested adjustment is for exceptional results obtained. The Court fully agrees with plaintiffs' counsel that this case resulted in an exceptional success with far-reaching consequences not only for the GPO employees, but for the entire printing industry and for women in the workplace throughout the nation. However, the Court finds that a 50% upward adjustment would result in a windfall contrary to the intent of Congress. Therefore, the Court will instead grant the plaintiffs a 25% adjustment based on their exceptional success.

    Initially, the Court notes that this case set precedents in many of the areas which were listed above as being unclear when the litigation began. This case was the first in this circuit to use quotas to remedy discrimination; it was one of the very few cases in the nation to successfully challenge an established apprenticeship program; it was the first case to hold that Equal Pay Act violations can occur when males and females operate different machines; and it also resolved several important questions regarding the retroactive and prospective effect of Title VII and the Equal Pay Act.

    Secondly, the plaintiffs were rewarded for their long struggle with an exceptional victory. The 382 class plaintiffs have received approximately $11.4 million in financial benefits to date and can expect to receive at least another $10 million over the next 7 years. Bailey affidavit at 1–9. Back pay for Title VII access violations alone have totaled over $5 million. Bailey affidavit at 2. Front pay for these access violations exceeded $500,000 in 1983. *Id.* In addition to these direct monetary benefits, this case resulted in many other improvements in the plaintiffs' workplace, including elimination of the four-year apprenticeship requirement for bookbinders and the opening of the door for women and other minorities to achieve supervisory status.

    Even beyond this, the impact of this suit has affected the entire printing industry. Sex-segregated unions have merged together. The shock waves of this case have spurred inquiries and investigations into the work environment of all public and private printers. This was certainly an exceptional case, with far-reaching impact on an entire business or profession.

    For all the foregoing reasons, the Court finds that the plaintiffs have met their burden of showing with specific facts and evidence that they are entitled to an upward adjustment in the loadstar figure based on the exceptional results in this case. The Court therefore will increase the award an additional 25% to reflect this.

    ■ Based on the foregoing discussion, the Court hereby awards plaintiffs the total amount of $1,604,029.55. This figure reflects the reasonable hours spent multiplied by the reasonable hourly rate for Mrs. Bailey and Mr. Dorsen, as charged by each attorney at the time the work was done. The figure also includes work done

by various associates, para-legals and law clerks working under Mrs. Bailey and Mr. Dorsen. In addition, the amount includes Mr. Boggs' hours multiplied by the reasonable rate of $150 an hour. Finally, the amount includes all costs expended in this litigation, to which there were no objection. The breakdown is as follows:

NORAH BAILEY

| Year | Rate | Hours | Year Total |
|------|------|-------|------------|
| 1973 | $ 40 | 99.25 | $ 3,970.00 |
| 1974 | 50 | 133.00 | 6,650.00 |
| 1975 | 60 | 421.75 | 25,305.00 |
| 1976 | 70 | 178.00 | 12,460.00 |
| 1977 | 90 | 396.50 | 35,685.00 |
| 1978 | 100 | 698.50 | 69,850.00 |
| 1979 | 120 | 724.00 | 86,880.00 |
| 1980 | 145 | 469.75 | 68,113.75 |
| 1981 | 145 | 646.00 | 93,670.00 |
| 1982 | 175 | 300.00 | 52,500.00 |
| 1983 | 185 | 405.75 | 75,063.75 |
| 1984 | 195 | 184.25 | 35,928.75 |
| TOTAL | | 4,656.75 | $566,076.25 |

DAVID DORSEN

| Period | Rate | Hours | Year Total |
|--------|------|-------|------------|
| 2/1/78— 1/31/79 | $ 90 | 34.75 | $ 3,127.50 |
| 2/1/79— 1/31/80 | 100 | 631.25 | 63,125.00 |
| 2/1/80— 1/31/81 | 110 | 529.00 | 58,190.00 |
| 2/1/81— 1/31/82 | 120 | 544.75 | 65,370.00 |
| 2/1/82— 1/31/83 | 135 | 90.75 | 12,251.25 |
| 2/1/83— 1/31/84 | 150 | 11.75 | 1,762.50 |
| 2/1/84— present | 160 | 0.50 | 80.00 |
| TOTAL | | 1,842.75 | $203,906.25 |

RODERIC V. O. BOGGS
660.75 hours × $150 an hour = $99,112.50

SUBTOTAL
$869,905.00

Associates at Ivins, Phillips & Barker
37.75 hours × $ 75 an hour = $ 2,831.25

Paralegals at Ivins, Phillips & Barker
118.25 hours × $ 50.00 an hour = $ 5,912.50

Associates at Sachs, Greenebaum & Taylor
Tom Hylden
14.50 hours × $100 an hour = $ 1,450.00
Piper Kent
50.50 hours × $ 60 an hour = $ 3,030.00
P. Scott
39.25 hours × $ 60 an hour = $ 2,355.00

Para-Legals and Law Clerks at Sachs, Greenebaum & Taylor
229.25 hours × $ 45.00 an hour = $ 10,316.25

TOTAL LODESTAR AMOUNT

| | |
|---|---|
| Norah Bailey | $566,076.25 |
| David Dorsen | 203,906.25 |
| Roderic V.O. Boggs | 99,112.50 |
| Sachs, Greenebaum & Taylor staff | 17,151.25 |
| Ivins, Phillips & Barker staff | 8,743.75 |
| Total Lodestar | $894,990.00 |

FEE ADJUSTMENTS

| | |
|---|---|
| Risk Factor: 50% upward adjustment | $447,495.00 |
| Exceptional Results: 25% upward adjustment | $223,747.50 |
| Subtotal | $1,566,232.50 |

Plus Expenses and Costs (Conceded)

| | |
|---|---|
| Ivins, Phillips & Barker | $ 31,346.87 |
| Sachs, Greenebaum & Taylor | 4,352.09 |
| Washington Lawyers Committee | 2,098.09 |
| Total costs and expenses | 37,797.05 |

TOTAL FEE AWARD — $1,604,029.55

## CONCLUSION

For the reasons set forth above, it is by the Court this 19th day of December, 1984, hereby

ORDERED that the defendant in this action remit the amount of $1,604,029.55 to the plaintiffs in satisfaction of the plaintiffs' application for an award of fair and reasonable attorneys' fees, including costs to which there was no objection.

## ORDER

In accordance with the Opinion of this Court filed of even date herewith, it is by the Court this 19th day of December, 1984, hereby

ORDERED that the defendant in this action shall remit to the plaintiffs the sum of $1,604,029.55 in satisfaction of the plaintiffs' application for an award of fair and reasonable attorneys' fees, including undisputed expenses and costs of $37,797.05.