Max LIBERLES, As President of and on Behalf of the Illinois Union of Social Service Employees, American Federation of State and Municipal Employees, AFL–CIO, Alice Allen, and All Those Persons Listed in Appendix A of the Complaint (Sub-Class A), Individually and on Behalf of All Others Similarly Situated, Wilhelmena Ashby and All Other Persons Listed in Appendix B of the Complaint (Sub-Class B), Individually and on Behalf of All Others Similarly Situated, Dorothy Bently, and All the Persons Listed in Appendix C of the Complaint, Individually and on Behalf of All Other Persons Similarly Situated, Catherine Alexander, and Other Persons Listed in Appendix D of the Complaint, Individually and on Behalf of All Others Similarly Situated, Plaintiffs,

v.

David L. DANIEL, Director of the Cook County Department of Public Aid, George Dunne, President of the Cook County Board of Commissioners, Joseph M. Solon, Chairman of the Civil Service Commission of Cook County, Joel Edelman, Director of the State of Illinois Department of Public Aid, Nolan B. Jones, Director of the State of Illinois Department of Personnel, Defendants.

No. 73 C 3217.

United States District Court, N.D. Illinois, E.D.

July 31, 1985.

George Galland, Davis, Miner, Barnhill & Galland, Chicago, Ill., for plaintiffs.

Barbara L. Greenspan, Asst. Atty. Gen., Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

After eleven years of litigation, the class in this Title VII case was awarded and has been paid a judgment of more than $13 million—one of the largest race discrimination money judgments ever paid in this country. Presently before the Court is the petition of plaintiffs' counsel ("petitioners") for attorney's fees and costs. For the reasons set forth below, we find that petitioners are entitled to an award of $451,208.69 in fees and costs from the State defendants.[1]

---

**1.** As explained in Part III of this opinion, petitioners already have entered into a settlement with the County defendants regarding the County's share of attorney's fees and costs.

## I.

Title VII of the Civil Rights Act of 1964 provides that a court, "in its discretion, may allow the prevailing party ... a reasonable attorney's fee as part of the costs...." 42 U.S.C. § 2000e–5(k). Pursuant to this statutory provision, petitioners request a total award of $960,424.75 in attorney's fees and out-of-pocket costs from the State. Petitioners reach the attorney's fee figure through a two-step calculation. First, they multiply the number of hours they worked by their requested hourly rates to obtain a "lodestar fee." Second, petitioners increase most of the lodestar fee by a multiplier of 3.5, which they contend is appropriate here. The State concedes that petitioner's lodestar fee is reasonable. Thus, the only contested issue is what, if any, multiplier is proper to yield an attorney's fee that is reasonable under the circumstances of this case.

Both the Supreme Court and the Seventh Circuit have recently discussed the use of multipliers in civil rights cases.[2] In *Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984), the Supreme Court reaffirmed its holding that although the "product of reasonable hours times a reasonable rate" normally provides a "reasonable" attorney's fee, "in some cases of exceptional success an enhanced award may be justified." *Id.*, 465 U.S. at ——, 104 S.Ct. at 1548, *quoting Hensley v. Eckerhart*, 461 U.S. 424, 435, 103 S.Ct. 1933, 1940, 76 L.Ed.2d 40 (1983). The Court then discussed some of the factors which might be used to increase the lodestar figure.

The *Blum* Court first rejected the use of the novelty or complexity of the issues to enhance a fee award. The Court reasoned that these factors presumably are reflected already in the number of billable hours recorded by counsel. Moreover, any special skill of the attorney in handling novel or complex issues should be reflected in the reasonableness of the attorney's hourly rates. *Blum*, 465 U.S. at ——, 104 S.Ct. at 1548–49.

Similarly, the Court noted that the quality of representation is generally reflected in the reasonable hourly rate. However, this factor may warrant an upward adjustment in rare cases where the fee applicant offers specific evidence that the quality of legal services rendered was superior to that one reasonably should expect in light of the hourly rates charged and that the success was "exceptional." *Id.*, 465 U.S. at ——, 104 S.Ct. at 1549.

The Court also considered whether a fee award should be increased because of the "results obtained." In *Hensley*, the Court had noted that this factor was especially important in determining reasonable attorney's fees where the plaintiff prevailed only on some of his claims for relief. *Hensley*, 461 U.S. at 436, 103 S.Ct. at 1940. However, in *Blum* the Court held that the results obtained "normally should not provide an independent basis for increasing the fee award" because the results generally will be subsumed within other factors used to calculate a reasonable fee. *Blum*, 465 U.S. at ——, 104 S.Ct. at 1549.[3]

The Court mentioned one other factor sometimes used to justify an upward adjustment of fees: the risk of not prevailing and thus not recovering any attorney's

---

**2.** The Supreme Court has observed that the provision for attorney's fees in 42 U.S.C. § 1988 was patterned after the fees provisions in Title II and VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000a–3(b) and 2000e–5(k), and § 402 of the Voting Rights Act Amendments of 1975, 42 U.S.C. § 19731(e). Moreover, the legislative history of § 1988 indicates that Congress intended that "the standards for awarding fees be generally the same as under the fee provisions of the 1964 Civil Rights Act." S.Rep. No. 94–1011, p. 4 (1976), U.S.Code Cong. & Admin. News 1976, 5908, p. 5912. Thus, the Court has stated that the same standards are generally applicable in all cases in which Congress has authorized an award of fees to a prevailing party. *Hensley v. Eckerhart*, 461 U.S. 424, 433 n. 7, 103 S.Ct. 1933 n. 7, 76 L.Ed.2d 40 n. 7 (1983). Accordingly, we need not distinguish the particular civil rights laws involved in each of the cases discussed below.

**3.** Related to this, the Court also stated its belief "that the *number* of persons benefited is [not] a consideration of significance in calculating fees." *Blum*, 465 U.S. at —— n. 16, 104 S.Ct. at 1549–50 n. 16 (emphasis in original).

fees. The majority opinion did not resolve the question whether this factor may be used properly to enhance an award of attorney's fees. *Id.*, 465 U.S. at —— n. 17, 104 S.Ct. at 1550 n. 17. Justice Brennan, on the other hand, in a concurring opinion reaffirmed his view that the risk of not prevailing is indeed a proper factor. *Id.*, 465 U.S. at ——, 104 S.Ct. at 1550–51 (Brennan, J., concurring).

Thus, in *Blum* the Supreme Court repeated its statement that the use of a multiplier may be justified in "some cases of exceptional success," and it left open the possibility that the risk of nonpayment may require an upward adjustment to provide a reasonable fee. Unfortunately, the Court did not explain what constitutes a case of exceptional success. Rather than defining the term, the Court simply ruled out certain factors which do *not* justify using a multiplier: novelty, complexity and, in most cases, quality of representation and the results obtained.

Although the Seventh Circuit Court of Appeals has not had occasion to define "cases of exceptional success" subsequent to *Hensley* and *Blum*, earlier Seventh Circuit opinions have discussed at some length the use of multipliers. In *In re Illinois Congressional Districts Reapportionment Cases*, 704 F.2d 380 (7th Cir.1983), the Seventh Circuit noted that although the award of attorney's fees is committed to the sound discretion of the district courts, they should not lightly employ multipliers in making fee awards. Rather, multipliers

"should be given only in cases that are significant and where the quality of the attorney's work is considerably above average." *Id.* at 384.

In that case, the Seventh Circuit approved the use of a multiplier based upon several factors. These included: the contingent nature of the attorney's fee,[4] the magnitude and complexity of the case, the excellent quality of the attorneys' work, the public interest served by plaintiff's counsel and the preclusion of plaintiff's attorneys from other employment because of the case. *Id.* at 382–83. This approach is consistent with that established by the Seventh Circuit in previous cases—after calculating the lodestar fee, the court may make adjustments for various other factors set out in the Code of Professional Responsibility as adopted by the American Bar Association.[5] *E.g., Chrapliwy v. Uniroyal, Inc.*, 670 F.2d 760, 763–64 n. 5, 769 (7th Cir.1982), *cert. denied*, 461 U.S. 956, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983); *Muscare v. Quinn*, 614 F.2d 577, 579 (7th Cir. 1980).

After the Supreme Court's opinion in *Blum*, however, some of the factors previously considered by the Seventh Circuit should no longer be used to justify the use of a multiplier. For example, the *Blum* Court clearly barred the use of the complexity or novelty of the issues. *Blum*, 465 U.S. at ——, 104 S.Ct. at 1549. The Seventh Circuit has not yet addressed the question of what factors should be considered still, nor has it had the occasion to

---

**4.** The Seventh Circuit has repeatedly held that this factor *alone* does not justify the use of a multiplier. *McKinnon v. Berwyn*, 750 F.2d 1383, 1392 (7th Cir.1984); *Bonner v. Coughlin*, 657 F.2d 931, 936 (7th Cir.1981). However, it may properly be considered as one of several factors in favor of a multiplier. *Illinois Reapportionment Cases*, 704 F.2d at 382.

**5.** Disciplinary Rule 2–106 states

Factors to be considered as guides in determining the reasonableness of a fee include the following:

(1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.

(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.

(3) The fee customarily charged in the locality for similar legal services.

(4) The *amount involved and the results obtained.*

(5) The time limitations imposed by the client or by the circumstances.

(6) The nature and length of the professional relationship with the client.

(7) The experience, reputation, and ability of the lawyer or lawyers performing the services.

(8) Whether the fee is fixed or contingent.

explain its interpretation of the Supreme Court's phrase "cases of exceptional success."

Perhaps the most detailed attempt so far to define "exceptional success" has been that of the Tenth Circuit Court of Appeals in *Ramos v. Lamm,* 713 F.2d 546 (10th Cir.1983). The Tenth Circuit stated that " '[e]xceptional success' justifying an enhanced fee may be based upon the performance of counsel—for example, victory under unusually difficult circumstances or with an extraordinary economy of time—or upon the result achieved—total victory or establishment of significant new law." *Id.* at 557. However, like the *Illinois Reapportionment Cases, Ramos* was decided a year before *Blum,* and its explanation of "exceptional success" has been limited to some extent by the Supreme Court. In particular, the Supreme Court rejected (in most cases) one of the two primary reasons offered by the Tenth Circuit for enhancing a fee: the results achieved in the case. *Blum,* 465 U.S. at ——, 104 S.Ct. at 1549.

To summarize, the Supreme Court has held that an enhanced fee might be reasonable in "cases of exceptional success"—and possibly where the attorneys risked not being paid for their work. But the Court has not defined "exceptional success" and in fact has ruled out certain factors previously used by the Seventh Circuit and other courts to decide whether a multiplier was justified. We will now consider the specific arguments petitioners make in favor of a multiplier and will attempt to determine their significance in light of the decisions discussed above.

## II.

█ Petitioners assert that their lodestar fee should be adjusted upward because of both the exceptional success they achieved and the substantial risk they incurred.[6] To explain their exceptional success, petitioners refer to the four factors outlined in *Ramos.* They contend that although only one of the factors enumerated by the Tenth Circuit is required to justify an enhancement of their fee, all the factors are present here.

First, petitioners argue that they attained "victory under unusually difficult circumstances." They begin by stating that the case took eleven years to win and then claim that *any* case that takes so long "clearly presents 'unusually difficult circumstances.' " We decline to recognize such a universal principle. Petitioners also stress the case's complexity, both factual and legal. However, the Supreme Court has ruled out complexity as a basis for a multiplier. *Blum,* 465 U.S. at ——, 104 S.Ct. at 1548–49.

Petitioners next explain how the rapid and significant changes in Title VII law during the pendency of this suit threatened at various points to obliterate plaintiffs' case. They also point out that there were significant factual gaps in the defendants' records concerning who had taken and passed hiring tests. Together, these circumstances required petitioners to "shift theories in midstream" and present a new theory focussing on the disparate racial impact of defendants' facially neutral assignment policy. To the extent that petitioners rely on the novelty of this theory to justify a fee multiplier, *Blum* defeats them. *Id.* But petitioners seem to argue, and we agree, that the quickly changing body of Title VII law coupled with the testing information missing from defendants' records presented "unusually difficult circumstances" above and beyond the novelty or complexity of this case.

Second, petitioners argue that they achieved "victory with an extraordinary economy of time." Acknowledging that this case took eleven years to be litigated, petitioners emphasize that they spent just over 2,000 attorney hours on the case. Considering the size of the judgment they

---

**6.** The State rather surprisingly claims that *Blum* eliminated "exceptional success" as a basis for a multiplier. As should be clear from Part I of this opinion (or a simple reading of the Su- preme Court's opinion), this claim is flatly wrong. *Blum,* 465 U.S. at ——, 104 S.Ct. at 1548.

obtained and the numerous legal battles they fought, this may indeed be considered unusually economical. The case was never settled; rather, it was litigated to judgment and to the Court of Appeals. Defendants filed several motions to dismiss, opposed class certification (even up to the Seventh Circuit), resisted legitimate discovery requests and raised numerous issues on appeal. *See Liberles v. County of Cook,* 709 F.2d 1122 (7th Cir.1983).

Third, petitioners claim a "total victory" from any perspective. This seemingly boastful claim appears to be well founded. Plaintiffs won one of this nation's largest race discrimination money judgments ever. The judgment is especially large given the relatively modest class size—some individual awards exceeded $45,000. Moreover, the class received every single dollar to which it claimed it was legally entitled, including prejudgment interest. In addition to money damages, class members were elevated in their job positions and will receive increased pensions. Plaintiffs' victory indeed is a total one.

Fourth, petitioners assert that they achieved the "establishment of new law." Most notably, they claim to have demonstrated the full range of the "disparate impact" theory and to have shown that individual damage hearings are not always necessary in this type of case. Petitioners also claim responsibility for minor clarifications in the law regarding EEOC charges, the need for an immediate motion for class certification, and the "necessary party" requirements of Fed.R.Civ.P. 19.

The one obstacle to petitioners' reliance on these third and fourth factors to justify a multiplier here is the *Blum* Court's holding that the "results obtained" normally do not warrant increasing the fee award. *Blum,* 465 U.S. at ——, 104 S.Ct. at 1549. As the Tenth Circuit explained in *Ramos,* a "total victory" or the "establishment of new law" are aspects of the "results obtained." *Ramos,* 713 F.2d at 557. How-

ever, the Supreme Court did not categorically bar the use of this factor, but only ruled it out "normally." We find that if the totality of victory or establishment of new law may ever properly be considered elements of "exceptional success," then they should be so considered in this case.

Petitioners also argue that the risk of nonpayment that they faced warrants the use of a multiplier. They claim that the risk was increased in this case by the great instability of the relevant body of law as well as by the long period of time in which they went uncompensated. In support of their claim, petitioners cite the affidavits of different academics which identify the risk factors present in Title VII litigation generally and in this action specifically. They also cite the affidavit of then Professor Richard Posner (now a judge on the Seventh Circuit Court of Appeals), filed in *Arenson v. Board of Trade,* 372 F.Supp. 1349 (N.D.Ill.1974), an antitrust case. In the affidavit Posner explains that a bonus is necessary to fully compensate attorneys who handle a suit on a contingency-fee basis.

The State concedes that the risk to counsel may justify the use of a multiplier. Apparently assuming that the multiplier should be inversely proportional to the risk (*e.g.,* a multiplier of 3.0 would be proper when the attorneys had a $\frac{1}{3}$ chance of succeeding and thus being paid), the State contends that a multiplier of 2.0 is the highest adjustment appropriate in this case because plaintiffs always had at least a 50 percent chance of prevailing.

Petitioners also seem to assume that the multiplier and risk should be inverse proportions.[7] However, they disagree strongly with the State's estimate of the plaintiffs' likelihood of success, arguing that "this was always an extraordinarily risky piece of litigation," thus justifying their request for "a multiplier well in excess of 2 on grounds of riskiness alone." Freed Affidavit at 14.

---

7. For example, attached to petitioners' reply is the affidavit of Professor Mayer Freed, which states that "if a case has a 0.5 probability of success (and therefore the attorney has 0.5 probability of being compensated), the appropriate multiplier would be 2." Freed Affidavit at 3.

We agree that risk is a proper basis for applying a multiplier, *see, e.g., Blum,* 465 U.S. at ——, 104 S.Ct. at 1550–51 (Brennan, J., concurring); *Illinois Reapportionment Cases,* 704 F.2d at 382; *Chrapliwy,* 670 F.2d at 770, and that petitioners should be compensated for the risk they faced in this case. We also agree that the multiplier and risk should be inversely *related;* that is, the upward adjustment for risk should be greater in a case where the attorney's chances of being paid are relatively smaller. However, the multiplier and risk should not be completely proportional. The problem of such a scheme was discussed recently by Judge Posner (who appears to view this issue differently from when he prepared the affidavit used in *Arenson* ) in *McKinnon v. City of Berwyn,* 750 F.2d 1383 (7th Cir.1984):

> The fundamental problem of a risk bonus is that it compensates attorneys, indirectly but effectively, for bringing unsuccessful civil rights suits, even though the attorney's fee statute is expressly limited to cases where the party seeking the fee prevails. *See* 42 U.S.C. § 1988. Suppose a plaintiff asks for and receives a multiplier of 2 because he had a 50 percent chance of losing the case. This means that if the plaintiff's lawyer tries 10 such cases and wins 5 (as one would expect, if the risk of loss is indeed 50 percent), he will be paid as if he had won them all; that is, he will be paid twice his normal charge for each of the 5 cases he won, to compensate him for getting nothing in the 5 cases he lost. Indeed, if the logic of the risk multiplier were applied consistently, the attorney's fee would be larger the riskier the case, even though this would mean rewarding lawyers for flooding the courts with unmeritorious litigation, something we very much do not need. Imagine a class of cases where only one in 50 plaintiffs prevails. Then the risk multiplier would be 50, and a lawyer who brought all 50 cases and

lost 49 would receive the same compensation that he would have received had he been certain to win all 50 cases (in which event there would have been no multiplier), rather than (virtually) certain to lose 98 percent of them.

*Id.* at 1392. Even the cases cited by petitioners do not support using the inverse proportion of the risk as the appropriate multiplier. For example, in *Thompson v. Barrett,* 599 F.Supp. 806 (D.D.C.1984), the court found that the plaintiffs' statistical chances of success were much lower than 19 percent. *Id.* at 815. The court did not apply a multiplier of over 5.26 (the inverse of 19 percent), but awarded a risk bonus of 50 percent (a multiplier of 0.5). *Id.*

Thus, petitioners are entitled to some enhancement of their fee to compensate them for both the risk they incurred and the extraordinary success they achieved. The question remains just what multiplier is proper. Petitioners claim that a 3.5 multiplier is reasonable, citing four pre-*Blum / Hensley* district court cases (two from the Northern District of Illinois) in which multipliers ranging from 3.5 to 4.5 were applied. Not surprisingly, the State cites several other cases in which a very meager multiplier (or none at all) was used. Indeed, as petitioners acknowledge, "cases can be found setting multipliers at virtually any level on any set of facts."

The Seventh Circuit, as noted earlier, has cautioned that "the district courts should not lightly apply large multipliers." *Illinois Reapportionment Cases,* 704 F.2d at 382. The Seventh Circuit has also stated that "we have never approved a multiplier as high as three." *Id.* at 384. In that particular opinion, the Court of Appeals decided that the multiplier of 3.0 awarded by the district court was to be replaced with a bonus of 20 percent. *Id.* The Court's other decisions have been just as parsimonious.[8]

---

**8.** *See Strama v. Peterson,* 689 F.2d 661, 665 (7th Cir.1982) (bonus of more than 50 percent totally rejected); *Tidwell v. Schweiker,* 677 F.2d 560, 570 (7th Cir.1982) (1.5 multiplier rejected), *cert.* denied, 461 U.S. 905, 103 S.Ct. 1874, 76 L.Ed.2d 806 (1983); *Chrapliwy,* 670 F.2d at 770 (application of $200,000 quality bonus limited); *Bonner,* 657 F.2d at 936–37 (rejecting any multiplier);

Considering this precedent and the import of *Blum* and *Hensley*, we believe a multiplier of 1.5 is reasonable here. Although this may appear generous in light of the awards in the opinions discussed above, the facts of this case clearly demonstrate that petitioners faced a significant risk of working without compensation, and they truly achieved an "exceptional success," if that term has any meaning.

### III.

In its memorandum opposing petitioners' request for fees and costs, the State claimed that the County defendants should be held liable for half of any fee award. We ruled to the contrary in an order dated December 17, 1984, holding that liability for fees and costs was to be allocated between the State and County defendants in proportion to their respective monetary liabilities for damages.[9] After that order was entered, the County settled its fee liability with petitioners. Thus, we must calculate and reduce to judgment only the amount attributable to the State.

Petitioners actually have filed two requests for fees and costs in this case. They filed their original petition before we decided the question of allocation, so we must reduce this request by the percentage attributable to the County. Applying a 1.5 (rather than the requested 3.5) multiplier to the attorney's fees sought yields a total fees amount of $532,547.75. The original petition also asks for $13,651.74 in costs, which the State does not contest. Of the total fees and costs of $546,199.49, the State is liable for 77.3 percent, or $422,212.21.

Petitioners also filed a supplemental fee petition asking for another $20,972.34 in fees and $8,024.14 in costs. These fees were calculated without any multiplier, and both fees and costs represent amounts at-tributable only to the State. Although we gave the State an opportunity to respond to this supplemental petition, the State raised no objection to it.[10] Therefore, the supplemental fee petition will be granted in its entirety, raising the total fees and costs due to petitioners from the State to $451,208.69.

In sum, we find that a multiplier of 1.5 is appropriate in the calculation of the State's attorney's fee liability to petitioners, based on the exceptional success petitioners achieved and the substantial risk they incurred. Petitioners are entitled to a total award of $451,208.69 in fees and costs from the State. It is so ordered.

---

*Kamberos v. GTE Automatic Electric, Inc.*, 603 F.2d 598, 604 (7th Cir.1979) (reducing multiplier from 50 percent to 25 percent), *cert. denied,* 454 U.S. 1060, 102 S.Ct. 612, 70 L.Ed.2d 599 (1981).

**9.** Petitioners assert, and the State does not dispute, that the County was liable for 22.7 percent

of the money damages, leaving the State with 77.3 percent of the total liability.

**10.** This is consistent with the State's previously stated position that the lodestar amount requested by petitioners was reasonable, but the use of a multiplier was improper.