The EQUAL EMPLOYMENT OPPORTU-
NITY COMMISSION, Gregory Jones,
Owen T. Sloan and Robert Jeffrey, Jr.,
Plaintiff-Intervenors,

and

William E. McBride, William H. Butler,
Lenno Edwards, Albert White, Brunice
McNeal, Ruben McGaughy, William
Forbush, Tyrone Coffee, Hilary R.
Jones, Dubois Gilliam, and Michael
Love, on behalf of themselves and all
others similarly situated, Plaintiffs,

v.

BURLINGTON NORTHERN INC.;
Brotherhood of Locomotive Engineers;
United Transportation Union, AFL–
CIO; Railroad Yardmasters of Amer-
ica, AFL–CIO; Brotherhood of Rail-
way, Airline & Steamship Clerks,
Freight Handlers, Express & Station
Employees, AFL–CIO; Brotherhood of
Maintenance of Way Employees, AFL–
CIO; American Train Dispatchers As-
sociation, AFL–CIO; International As-
sociation of Machinists & Aerospace
Workers; International Brotherhood of
Boilermakers, Iron Shipbuilders,
Blacksmiths, Forgers & Helpers, AFL–
CIO; Sheet Metal Workers' Interna-
tional Association, AFL–CIO; Interna-
tional Brotherhood of Electrical Work-
ers, AFL–CIO; Brotherhood of Railway
Carmen of U.S. and Canada, AFL–CIO;
International Brotherhood of Firemen
& Oilers, AFL–CIO; Brotherhood of
Railroad Signalmen, AFL–CIO, Defend-
ants.

No. 78 C 269.

United States District Court,
N.D. Illinois, E.D.

Sept. 20, 1985.

---

## MEMORANDUM

LEIGHTON, District Judge.

### I

This multi-district litigation involves suits, some of them class actions, and intervenor complaints which allege that a railroad corporation and its unions have discriminated against Negroes in employment opportunities. On the day of trial, in a spirit of compromise, cooperation, and amicability, lead counsel for plaintiffs and the class, and the chief lawyer for the railroad, settled all the claims of the plaintiffs and

members of the class, a group whose size has been estimated as between 5,000 and 20,000 Negroes. Then, the lawyers agreed on a consent decree which granted plaintiffs, members of the class, and charging parties, monetary recovery and general as well as special relief.

In addition, the railroad agreed to pay the attorney fees of counsel for the private plaintiffs. Later, this court approved the consent decree; and in accordance with its terms, the railroad has paid the fees and expenses of all the lawyers in the case except lead counsel for plaintiffs and the class. Further, without contest, it has paid EEOC the costs which the agency has disbursed in the course of this litigation.

Now, lead counsel have filed petitions asking this court to determine the attorney fees, plus a multiplier, which the railroad should pay them, and the amount of the advanced costs for which they should be reimbursed.[1] The petitions have been briefed; and in the course of its written submissions, the railroad concedes that petitioning counsel are entitled to reasonable fees; that the number of hours claimed were worked by counsel and their legal assistants; and that the expenses for which reimbursement is sought were advanced and would be paid by the railroad.

However, the railroad contends that lead counsel seek hourly rates which are at least ten percent to twenty percent too high; and that the lower rates it proposes are equal to those charged by experienced lawyers who defend employment discrimination suits in the communities where petitioning counsel practice. The railroad argues that the fees, plus a multiplier, which petitioning counsel seek, are unreasonable; it insists that the record of this case does not support any enhancement of the lodestar figure to which lead counsel undoubtedly are entitled. Therefore, the parties ask this court to resolve four issues: first, whether the rates per hour at which lead counsel seek attorneys' fees are reasonable; second, whether the fees awarded to lead counsel should bear interest from April 2, 1984, the date this court fully approved the consent decree; third, whether this case was the kind of "exceptional success" that would justify lead counsel being given a multiplier as a bonus for the legal work they have performed; and fourth, whether the defendant unions should be ordered to assume the responsibility for some portion of the fees and expenses which are ordered paid to counsel for plaintiffs and the class.

## II

On August 22, 1974, an EEOC commissioner, acting pursuant to Sections 706 and 707 of the Civil Rights Act of 1964, as amended, filed a charge which alleged that Burlington Northern, Inc., a multi-state railroad corporation,[2] and thirteen international unions representing BN employees, had been "unlawfully discriminating against Blacks, Spanish-surnamed Americans, orientals, American Indians and women because of their race, color, national origin and sex with respect to recruitment, hiring, job assignment, job classification, discharge, wages, promotional opportunity, training and other terms, conditions and benefits of employment." EEOC propounded interrogatories which were answered by the railroad, demanded documents which were produced, and interviewed or deposed BN officials. This pro-

---

1. Burlington does not question the standing of lead counsel to file these petitions. In view of this, the court does not either, although it is aware of at least one recent case holding that lawyers "have no standing whatsoever to file an application for a direct award of attorneys' fees under section 2000e–5(k) [of Title VII]." *Rainsbarger v. Columbia Glass & Window Co.,* 600 F.Supp. 299, 301 (W.D.Mo.1984). This court, as did the court in *Rainsbarger,* will construe the petitions as having been filed by the named

plaintiffs, it being conceded they are the prevailing parties as required by Section 706(k) of Title VII. Further, the court will assume that these petitions were filed in accordance with the wishes of named plaintiffs, and at their direction, or with their permission.

2. Hereafter, Burlington Northern, Inc., will be referred to as "Burlington", "the railroad", or by the acronym "BN".

cess, which was mainly investigatory, continued for a number of years.

In July 1977, the first of some thirteen or fourteen civil actions was filed against Burlington in the United States District Court for the District of Minnesota. It was a suit by Claude Brown against BN and one of its unions alleging race discrimination in employment opportunities. Thereafter, different suits were filed by other plaintiffs in federal courts in Washington, Nebraska, Missouri, and in this district. All of the complaints alleged racial discrimination in employment, some asserting claims under 42 U.S.C. § 1981, but all invoked Title VII of the Civil Rights Act of 1964. Some of the plaintiffs sought relief only for themselves, others were class suits against BN alone, while others named as co-defendants a number of unions that represented BN employees.

The first of the suits filed in this district was by William E. McBride and William H. Butler, Jr., as a system-wide class action.[3] The case was assigned to the docket of Judge John Powers Crowley; the lawyers representing the plaintiffs were from Davis, Miner & Barnhill, a small but experienced Chicago law firm that specializes in civil rights litigation. Among the suits filed in the district court of Minnesota, was a class action by William E. Forbush, against BN and unions representing its employees. Plaintiff and the class in that civil action were represented by Paul C. Sprenger of Sprenger, Olson and Schutes, also a small firm that specializes in civil rights litigation. In both *McBride* and *Forbush* the lawyers undertook representation of plaintiffs and the class under contingency fee agreements.

In *McBride*, plaintiffs moved for class certification to which BN objected. At the same time, EEOC filed a motion to intervene in the case. On December 22, 1978, Judge Crowley granted the plaintiffs' motion for class certification and EEOC's motion to intervene.[4] A little more than a month later, January 31, 1979, Sprenger, representing Forbush in the district court in Minnesota, Barnhill, representing McBride and Butler, three attorneys in two other cases pending in this district, and Bruce Elfvin, staff attorney for EEOC, appeared before Judge Crowley and proposed an agreed order "concerning the organization of plaintiffs' Steering Committee, Committee of the Whole, and to the designation of Lead Counsel, . . . ." The proponents stated that their purpose was "to assist the Court in the coordination of this litigation." The duties and responsibilities of the lawyers who were to be lead and co-lead counsel were described and the function of the Steering Committee and Committee of the Whole were defined. Judge Crowley approved the proposed order; it was entered as of the date of its presentation. Sprenger and Barnhill, or Judson Miner of the Barnhill firm, were designated as lead counsel for plaintiffs and the class; Bruce Elfvin was named co-lead counsel.

At the time, the suit in *McBride* had been on file more than one year. Both Barnhill and Sprenger knew the complexity of the cases, the scope of the allegations and charges made against BN, and the difficulties of proof. The lawyers who accepted the responsibilities of lead counsel knew by then the positions that had been taken by BN in the defense of the charges of race discrimination. Neither at the time the order was presented nor at any other proceeding before Judge Crowley was there any statement made by the designat-

---

3. Lead counsel persist in calling this "a nation-wide" class action. However, as this court understands it, Burlington is not a nation-wide railroad corporation, it operates in twenty states, all in the western part of the country. It does not employ workers nation-wide. Therefore, it is more accurate to refer to this suit as "a system-wide class action."

4. The class was defined as:

All Negro citizens who have been or will be employed by the Railroad System of the Transportation Division of BNI in the United States and who have been, are being, or as a result of the operation of current policies will be discriminated against in hire and terms or conditions of employment such as seniority, training, promotion, wages, transfers, lay off or discharge because of their race.

ed lead counsel concerning the difficulties of proof, the burdensomeness of the cases with regard to expenses, or the obligations assumed by them under the contingency agreements each had entered with their plaintiffs.

Soon after Judge Crowley certified the class in *McBride,* prompted by the pendency of a number of cases in other districts, BN moved before the Judicial Panel on Multidistrict Litigation for consolidation of the cases in order to coordinate pretrial proceedings. On April 11, 1979, the panel ordered the cases transferred to this district and assigned to Judge Crowley as *In Re Burlington Northern, Inc. Employment Practices Litigation,* MDL 374. Thereafter, subsequently filed cases were also transferred to this district as "tagalong actions." Then in June 1979, twelve of the named plaintiffs in six of the cases against BN, together with EEOC, filed a first consolidated complaint in this district under the case number of *McBride.* This consolidated complaint invoked the provisions of both Title VII and 42 U.S.C. § 1981. The defendants were BN and thirteen unions that represented BN employees.

In the balance of 1979, the parties continued with discovery. Plaintiffs obtained detailed information concerning the railroad's workforce from BN computer tapes and from the Railroad Retirement Board, reflecting BN's yearly reports for the period from the 1970 merger that created BN, to 1980. Based on these tapes, lead counsel caused to be prepared statistical printouts which were served on BN in conjunction with requests for admission and propounded interrogatories. The discovery conducted by lead counsel extended to BN's employment policies and depositions of its regional personnel managers as well as several members of its Human Resources Department staff. Union representatives were also deposed and requests for production of documents were served on defendant unions.

Lead counsel also sought computer tapes and hard copy documents from the unions.

These detailed discovery efforts proceeded through the year 1980. During the spring of 1981, Judge Crowley announced he was going to resign from the federal bench, effective as of June 30, 1981. Thereupon, EEOC moved to transfer MDL 374 as the case stood before Judge Crowley to a judge in the United States District Court for the District of Minnesota. The MDL panel ruled in October 1981 that the consolidated cases were to be assigned to this docket for the remainder of the coordinated pretrial proceedings.

These were extensive; typical of litigation like as this one. They included rulings on a multitude of discovery disputes that involved what lead counsel have said were "hundreds of thousands of documents" produced by BN and the union defendants. These documents were stored in two depositories, one in Chicago, Illinois, and one in St. Paul, Minnesota, established by a pretrial order which Judge Crowley had entered early in the litigation. The depositions involved all of BN's top management personnel, and included responsible officials of the unions. The court was required to rule on a motion filed by BN to redefine the class and one asking for vacature of the order that had permitted EEOC to intervene in the lawsuit. Status hearings were conducted by this court beginning January 22, 1982 and involved the entry of several pretrial orders, one setting out detailed discovery deadlines including dates for exchange of exhibits as well as other matters preparatory to trial. Orders were also entered relating to an appeal from a district court order concerning certain BN witnesses' answers to questions about the railroad's affirmative action program.

By the end of 1982, lead counsel made certain decisions concerning preparation for trial. These included the selection, retention and employment of experts. They decided to retain Dr. Richard Barrett, a well-known testing expert; Dr. Richard Hoyt, an expert in economics who was to testify about the compiled computer data base and on issues of damages; Dr. Ste-

phan Michaelson, a top expert in the interpretation and analysis of race data; Dr. Rebecca Krem, an expert in statistics; Dr. Charlotte Striebel, a Ph.D. in mathematics, who was to testify in rebuttal; and Dr. Herbert Hill, a former NAACP staff member and a recognized student of race discrimination in the railroad industry. Compensation of these experts was assumed by lead counsel in accordance with agreements entered into with each expert.

Throughout the early part of 1983, lawyers for Burlington and lead counsel submitted to the court agreed orders concerning anticipated trial exhibits and other matters. Also, a number of orders were entered allowing intervention of additional plaintiffs, the filing of an amended consolidated complaint, and the transfer to this docket of tagalong cases that had been filed after this court was assigned the multidistrict litigation. In the meantime, the parties proceeded with intensive discovery and final preparation. The case was set to be called for trial on November 7, 1983 and the final pretrial conference was held October 25, 1983. Then, in the early morning hours of the day of trial, a complete settlement was reached. The parties negotiated a consent decree which received the court's preliminary approval on November 22, 1983, and full approval on April 2, 1984.

Under the terms of the decree, BN agreed to pay $10 million, to be held in a fund for those who claimed, and who could establish, that during the designated period, they had been subjected to racial discrimination in hiring, promotion, or discharge. The fund was non-reversionary so that the full $10 million plus interest it may earn, will be paid to qualified claimants under the consent decree. BN retained no interest in the fund and distribution now depends on the number of claims filed and allowed. The $10 million dollars was deposited soon after full approval of the consent decree and has been earning interest since that time.

Class members entitled to make claims against the fund are defined broadly, thus making them eligible for injunctive relief which requires BN to hire Negroes at specified rates for nine years after approval of the decree. For example, each year BN must hire Negroes as officials, managers, and salespeople at two times the Negro national availability for these jobs as determined by relevant census information. In all other jobs which did not have Negroes equal to their availability in the preceding year, each year BN must hire Negroes at rates ranging from 2 to 1.5 times their availability.

Further, by the terms of the decree, BN must promote Negroes from scheduled to exempt jobs at a rate of 1.5 times their availability for such promotions and it must circulate information about job opportunities in a meaningful manner, particularly to Negro organizations. BN agreed to a priority hiring of rejected Negro applicants for jobs and providing neutral references for those it had previously listed as discharged for cause. The decree provides that all persons who have been locked into certain lower paying positions—those jobs to which Negroes traditionally have been assigned—have the right to transfer to higher paying positions, and retain the seniority of their lower paying jobs. BN also agreed to train Negroes to be locomotive engineers at a rate of no less than 15% of the persons trained. In the last subdivision of the decree, BN agreed to pay all lawyers for the plaintiffs and EEOC "their costs including experts' fees, and including (except as EEOC) reasonable attorneys' fees...."

Based on this provision, BN has paid EEOC $512,940.33 of an agreed sum of $675,000 and through agreements approved by this court, it has paid ten lawyers for the plaintiffs in the tagalong and related cases a total of $324,200 for fees and advanced expenses. However, no agreement has been reached with lead counsel for plaintiffs and the class, consequently they have filed separate petitions for fees and for reimbursement of expenses.

The lead counsel in this case, as designated by the agreed order of January 31, 1979, are "Charles Barnhill, Jr., . . . or Judson H.

Miner" of Davis, Miner, Barnhill & Galland, a three-partner, three-associate law firm located in Chicago; and Paul C. Sprenger of Sprenger, Olson & Shutes, P.A., a three-attorney law firm whose offices are in Minneapolis, Minnesota. Both firms in which lead counsel are senior partners specialize in representing plaintiffs in civil rights and Title VII cases. They and members of their firms are able and experienced practitioners in complex class litigation involving charges of race discrimination in employment opportunities. Charles Barnhill has been principal attorney for plaintiffs in numerous landmark civil rights cases. In fact, he and members of his firm have earned the reputation of being among the leading lawyers in civil rights cases. Paul Sprenger and his firm are recognized as experienced in complex litigation defending and prosecuting civil rights cases, as well as antitrust suits.

Both firms undertake their employment discrimination class actions on a contingency basis, depending on court-awarded fees. As to Charles Barnhill, two judges of this court have recently held that $170 was a reasonable hourly rate for his services and awarded him that basic rate. Between seventy-five and eighty-five per cent of the law firm hours expended by the Sprenger firm were on a contingency basis. When billing fee-paying clients, it has charged $180 or more per hour for Paul C. Sprenger's services and $160 or more per hour for the firm's other two partners. These private clients have included, among others, the Swedish and West German governments, the Smead Manufacturing Company, the American Lutheran Church, and the Minnesota Education Association. Although there is a dispute between the parties concerning the reasonableness of the rates requested by lead counsel, there is evidence that the rates requested by them are consistent with what lawyers of comparable skill and experience charge for similar services in Chicago and Minneapolis, and what lead counsel could charge for their services in other litigation.

Relevant to these facts, it appears that sometime in 1977, William E. McBride and William H. Butler, Jr., went to the offices of Davis, Miner, Barnhill & Galland about the possibility of their representing them in a class action lawsuit against BN. Charles Barnhill, who conducted the initial investigation, interviewed a number of the company's employees, both Negro and Caucasian, and did research concerning the experiences of Negroes with American railroads regarding discrimination in employment opportunities. He concluded that historically BN, as well as other railroad and railway unions, discriminated against Negroes in hiring, promotions, and other employment practices. He noticed that a number of Burlington job classifications were filled by a disproportionate number of Negroes or Caucasians; that many employment practices were subjective and standardless; and that actual hiring or promotion patterns in the years immediately prior to 1977 could not be determined. Consequently, on January 24, 1978, Barnhill filed *McBride, et al., etc. v. Burlington Northern, Inc.*, No. 78 C 269, in this court, the case which became the hub of all the consolidated actions in this multidistrict litigation.

Later that year, on October 17, Paul Sprenger filed *William E. Forbush, etc. v. Burlington Northern, Inc., et al.*, No. Civ. 4–78–461, in the district of Minnesota, one of the cases that was consolidated in this court with *McBride*. Thereafter, Barnhill and Sprenger, assisted by members of their respective firms, cooperated in handling the two suits. In January 1979, by an agreed order, they were designated lead counsel for plaintiffs and the class. In the six years of litigation from January 1978 to March 31, 1984, they, their partners and associates, worked and adequately documented a total of 12,228.2 attorney hours for which they seek reimbursement in fees. In addition, they ask to be paid for a total of 5,157.8 hours of work by their paralegals. Burlington concedes that the total number of hours claimed is reasonable and properly substantiated. The Barnhill firm advanced $206,672.15 in expenses, the Sprenger firm $925,257.04, which have been properly documented and will be paid

by the railroad, subject to its right to seek contribution from the union defendants.

The rates per hour which lead counsel ask this court to award range from $180 for Sprenger, $170 for Barnhill, to $95 per hour for an associate in the Barnhill firm. Each lead counsel asks that the paralegals in his firm be paid $40 per hour. Thus, at the requested rates, the following is the lodestar fee for lead counsel, each lawyer, and paralegals who assisted them in representing plaintiffs and the class.

| The Attorney | Total Hours | Hourly Rates | Lodestar Fees |
| --- | --- | --- | --- |
| Paul C. Sprenger | 3,222.25 | $180 | $ 580,005.00 |
| Eric L. Olson | 1,206.50 | 160 | 193,040.00 |
| Robert L. Shutes | 3,227.25 | 160 | 516,360.00 |
| SO&S Paralegals | 3,587.00 | 40 | 143,480.00 |
| | | | $1,432,885.00 |
| Charles Barnhill | 2,918.50 | $170 | $ 496,145.00 |
| Judson S. Miner | 97.50 | 170 | 16,575.00 |
| George F. Galland | 5.00 | 170 | 850.00 |
| Briget Arimond | 1,267.50 | 110 | 139,425.00 |
| Nancy J. Anderson | 212.50 | 135 | 28,687.50 |
| Paul Strauss | 71.20 | 95 | 6,764.00 |
| DMB&G Paralegals | 1,570.85 | 40 | 62,834.00 |
| | | | $ 751,280.50 |
| Total Lodestar Fees: | | | $2,184,165.50 |

Lead counsel request that these fees be subjected to a multiplier. In their original applications, supported by affidavits of two highly respected academic lawyers, those of a number of practitioners in employment discrimination cases, several from experts, and the testimony of experienced trial lawyers, petitioning counsel had asked for a multiplier of 3.5, but after the matter was heard, the multiplier requested was reduced to 2.5. The following is the amount of fees, the lodestar plus the multiplier, which lead counsel are asking for themselves, their partners, associates, and paralegals.

| The Attorney | Lodestar Fees | Requested Multipliers | Amount |
| --- | --- | --- | --- |
| Paul C. Sprenger | $580,005.00 | 2.5 [5] | $1,347,345.00 |
| Eric L. Olson | 193,040.00 | 2.5 | 478,340.00 |
| Robert L. Shutes | 516,360.00 | 2.5 | 1,286,340.00 |
| SO&S Paralegals | 143,480.00 | 1.0 | 143,480.00 |
| | | | $3,255,505.00 |
| Charles Barnhill | $496,145.00 | 2.5 | $1,186,991.00 |
| Judson S. Miner | 16,575.00 | 2.5 | 41,437.50 |
| George F. Galland | 850.00 | 2.5 | 2,125.00 |
| Briget Arimond | $139,425.00 | 2.5 | $343,695.00 |
| Nancy J. Anderson | 28,687.50 | 2.5 | 71,718.75 |
| Paul Strauss | 6,764.00 | 2.5 | 16,838.75 |
| DMB&G Paralegals | 62,834.00 | 1.0 | 62,834.00 |
| | | | $1,725,640.00 |
| Total Fees Requested: | | | $4,981,145.00 |

## III

### A

Despite conceding that the total hours claimed are reasonable, that lead counsel, their partners and associates are able and experienced EEOC practitioners and that they are entitled to an award of reasonable fees which it is willing to pay, Burlington contends that the hourly lawyer rates which lead counsel seek are ten to twenty per cent too high. It argues that an award of attorneys' fees such as is sought in this case should be calculated according to prevailing market rates and that in this process, the burden is on the fee applicant to prove the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation. Lead counsel, according to Burlington, have not carried this burden; instead, they proceed on a theory of "national" rates which are not relevant to a proper consideration of their petitions.

Petitioning counsel, of course, do not agree. They argue that this record now contains abundant evidence proving that the requested rates are reasonable. They say that the rates they request have been awarded them in the past; that the Sprenger firm charges its hourly-billed clients the rates requested; and that the rates requested are those being charged by attorneys practicing complex Title VII litigation in Chicago, Minneapolis, and across the country. Moreover, lead counsel contend that the hourly rates in question are well below those paid by Burlington to its lawyers, even if allowance is made for the

5. From the date of settlement, November 7, 1983 through March 31, 1984, the multiplier requested is 1.0 which does not affect the total lodestar fees for that period.

volume discount given Burlington in this case.

As is usual in disputes of this kind, there is some merit in the arguments of both sides. Lead counsel are correct in saying that they and members of their firms are able, experienced, and qualified practitioners in class action suits involving issues arising from race discrimination in employment; in fact, Burlington does not claim otherwise. And, it is true, as they assert, that two judges of this court have awarded Charles Barnhill attorney's fees at the hourly rate he seeks in this case. Burlington argues, however, that those instances did not involve contests over fee awards or, at least, awards that were as vigorously opposed as it opposes the applications of lead counsel here.

While it may be true that the two fee awards to Barnhill were not vigorously contested or were by agreement, this fact would increase their relevancy to this case because it would show complete agreement, by the judges and the parties, that the rate of $170 per hour was reasonable. In contrast with the Barnhill firm, Paul Sprenger's firm does considerable work on an hourly-billed basis for which the charge per hour is $180 for Sprenger and $160 for the services of his two associates, Olson and Shutes. These are the rates they seek in this case.

 It is well settled in this circuit that the object of a fee determination is to simulate the results which would be obtained if the lawyer involved were dealing with a paying client. *McKinnon v. City of Berwyn,* 750 F.2d 1383, 1393 (7th Cir.1985); *Henry v. Webermeier,* 738 F.2d 188, 195 (7th Cir.1984). This is so because the hourly rate a private attorney ordinarily charges his clients for the hours worked is generally the proper hourly market rate for his services. *Chrapliwy v. Uniroyal, Inc.,* 670 F.2d 760, 769 (7th Cir.1982). However, if there is no evidence of hourly rates charged paying clients or awarded previously to petitioning counsel, the fee determination should be based on the market rate for the services the lawyer rendered; that is, the rate that lawyers of similar ability and experience in the community normally charge their paying clients for work and responsibility undertaken in similar litigation. *Henry v. Webermeier,* 738 F.2d at 193.

 In setting an appropriate fee award on these applications (since the reasonableness of the total hours claimed is conceded), this court must determine whether petitioning counsel have shown that rates they seek are those they charge paying clients, or are ones at which they have been awarded fees, or are the prevailing rates paid to comparable attorneys in the community where they practice. The product of the number of hours multiplied by the reasonable hourly rate is the amount of the reasonable fee. *Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983). This is normally the award of attorneys' fees contemplated by Title VII; it is the amount that is presumably reasonable and petitioners for fees have the burden of rebutting this presumption. *Blum v. Stenson,* 465 U.S. 886, 104 S.Ct. 1541, 1548, 79 L.Ed.2d 891 (1984). Burlington, on the other hand, is correct in pointing out that the aim of a fees award "is to permit and encourage the redress of the civil rights violations of victims but not to create a civil rights fee bank to be liberally drawn upon by lawyers for their own welfare." *Coop v. City of South Bend,* 635 F.2d 652, 655 (7th Cir. 1980); *see also McPherson v. School Dist. No. 186,* 465 F.Supp. 749, 756 (S.D.Ill.1978).

This latter point leads the court to observe that there is some merit in Burlington's contention that the hourly rates sought by lead counsel are too high. For one thing, the arguments in support of the petitions involve a degree of self-touting. There is justification for the criticism that lead counsel's witnesses on hourly rates, although capable and respected attorneys, disclose little familiarity with petitioning counsel, with this litigation, or with rates charged by similar practitioners in class suits involving claims of race discrimination in employment opportunities.

■ However, on balance, the pertinent factors having been considered, *see Johnson v. Georgia Highway Express*, 488 F.2d 714 (5th Cir.1974), this court concludes that the requested hourly rates are not so high as to warrant their rejection. As to each lawyer involved, there is evidence that the hourly rates requested have either been paid by clients or awarded to them by a court in the past. Contrary to Burlington's contentions, these matters are not subject to precise mathematical determinations. Lead counsel have shown that the Sprenger firm has charged clients the rates requested for Paul Sprenger and his partners; Charles Barnhill, on at least two occasions, has been awarded fees at the rate requested for him. The requested rates approximate, as close as these matters can, the prevailing ones paid to comparable attorneys in the relevant community. In this case this is Chicago, Illinois, for Charles Barnhill or Judson Miner and their associates; Minneapolis, Minnesota, for Paul Sprenger and his partners. *Hensley v. Eckerhart*, 461 U.S. at 433–34, 103 S.Ct. at 1939–40 (1983); *Blum v. Stenson*, 104 S.Ct. at 1548. Therefore, for the total hours they worked, to and including March 31, 1984, lead counsel, their partners, associates, and paralegals, are awarded the hourly rates they ask for. Based thereon, the following are the lodestar fees to which they are entitled.

| The Attorney | Total Hours | Hourly Rates | Lodestar Fees |
|---|---|---|---|
| Paul C. Sprenger | 3,222.25 | $180 | $ 580,005.00 |
| Eric L. Olson | 1,206.50 | 160 | 193,040.00 |
| Robert L. Shutes | 3,227.25 | 160 | 516,360.00 |
| SO&S Paralegals | 3,587.00 | 40 | 143,480.00 |
| | | | $1,432,885.00 |
| | | | |
| Charles Barnhill | 2,918.50 | $170 | $ 496,145.00 |
| Judson S. Miner | 97.50 | 170 | 16,575.00 |
| George F. Galland | 5.00 | 170 | 850.00 |
| Briget Arimond | 1,267.50 | 110 | 139,425.00 |
| Nancy J. Anderson | 212.50 | 135 | 28,687.50 |
| Paul Strauss | 71.20 | 95 | 6,764.00 |
| DMB&G Paralegals | 1,570.85 | 40 | 62,834.00 |
| | | | $ 751,280.50 |
| | | | |
| | | Total: | $2,184,165.50 |

Burlington will be ordered to pay this total sum in fees to lead counsel, with interest from the date of the order entered in accordance with this memorandum. *Preston v. Thompson*, 565 F.Supp. 294, 297 (N.D.Ill.1983).

**B**

Lead counsel, however, do not agree with this determination of the date their fees are to earn interest. They assert that interest on their fees should be calculated from the date this court fully approved the consent decree because that approval fixed Burlington's obligation to pay plaintiffs' attorney fees, and left only the amount to be determined. They argue that, as this court ruled earlier, and as the Seventh Circuit explained in *Gautreaux v. Chicago Housing Authority*, 690 F.2d 601, 612 (7th Cir. 1982), current rates should be awarded to adjust for inflation of the period lead counsel waited for payment of their fees. They point out that almost a year has passed since this court heard evidence on the fee petitions, during which there has been a substantial increase in the costs of living, and some law firms have increased their hourly rates. Accordingly, lead counsel argue that there should be either an upward adjustment of the hourly rates or interest retroactive to the date the consent decree was fully approved. "This use of current rates simplifies the Court's task and roughly counterbalances the inflationary loss suffered by the attorneys because of the long delay in recovery of their fees." *In re Ampicillin Antitrust Litigation*, 81 F.R.D. 395, 402 (D.D.C.1978).

■ Although they do not use the term nor discuss the concept, it is obvious that what lead counsel are asking is prejudgment interest on the fees awarded them. Generally, prejudgment interest in a case governed by federal law is a matter left to the trial court. *Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.*, 676 F.2d 1291, 1310 (9th Cir.1982). An award of prejudgment interest is responsive to considerations of fairness; if it will act as a penalty on a relatively innocent defendant, the district court has discretion to refuse to make such an award. *Sanders v. John Nuveen & Co.*, 524 F.2d 1064, 1075 (7th Cir.1975).

Stating the principles of these cases serve to reveal why lead counsels' conten-

tions and arguments on this matter must be rejected. It was they who petitioned for fees at an hourly rate they considered high enough, and requested a multiplier, first of 3.5, and then at 2.5. As they had a right to, they chose to litigate with Burlington the issues thus raised, and defendant, as it had the right to, opposed both the hourly rates requested and the multiplier sought. In other words, this was a good faith dispute originated by lead counsel and joined in, with vigor, by Burlington. Despite the Supreme Court's admonition that "[a] request for attorney's fees should not result in a second major litigation," *Hensley v. Eckerhart*, 461 U.S. at 437, 103 S.Ct. at 1941, the proceedings on these petitions have developed into just that. This court has permitted a liberal schedule for hearing of evidence and the submission of briefs, memoranda, affidavits, and exhibits. The last filing, one that interferred with this court's ruling schedule, was on September 4, 1985. Lead counsel cannot have it both ways. They cannot elect to litigate, take all the time afforded them by the court, and then get interest applied retroactively on a fee award of over $2 million, to the date the court fully approved the consent decree, a period of almost eighteen months. To put it bluntly, what lead counsel argue for, if granted them, would be grossly unfair.

■ For these reasons, in the exercise of its sound discretion, this court will not order an upward adjustment of the lodestar fees; and, in its judgment, lead counsel are not entitled to interest on fees awarded them retroactive to the date full approval was given to the consent decree. *Cf. Greenspan v. Automobile Club of Michigan*, 536 F.Supp. 411 (E.D.Mich.1982).

**6.** When lead counsel first filed their petitions for fees, they requested, with detailed arguments, a multiplier of 3.5. But when they submitted their proposed findings of fact and conclusions of law, their requested multiplier, without explanation, was reduced to 2.5.

**7.** This is the position Burlington takes in closing brief on the issue of a multiplier or upward fee although its answer to the petitions for fees

### C

This brings up the issue whether the results achieved by lead counsel make this the kind of "exceptional success" that would entitle their being paid not only the lodestar fees but a multiplier as "an upward adjustment" for the legal work they have performed. They argue that on the record there must be a multiplier in order to compensate for the extreme risk they undertook in representing plaintiffs and the class, the delay they have experienced in receiving payment, and the relief, monetary and injunctive, they have obtained for their clients in this somewhat extended employment discrimination case. Lead counsel insist that they have shown by proper evidence, and have demonstrated beyond question, that no lawyer competent to litigate this kind of vigorously defended lawsuit would have been willing to handle the litigation for the normal hourly fee. They point to the huge amount of attorney time they have devoted and to the expenses they have advanced; between them, their two firms have expended a total of $1,131,929.19 in expenses on behalf of evidently indigent litigants. Lead counsel detail the catalog of difficulties they encountered and overcame because of their professional abilities and devotion to the cause of their clients. They now contend that unless Burlington is ordered to pay a multiplier of at least 2.5,[6] in cases such as this one, enforcement of Title VII will suffer.

Burlington, with an intensity of litigation vehemence its lawyers have not displayed during any other aspect of this controversy, contends that no multiplier should be awarded.[7] It argues that while the consent decree contains significant and appropriate relief, one that some might view as very

contains the somewhat vague concession that "[b]ecause this was a large case and involved substantial expenses, some enhancement may be permissible, but under no circumstances should the multiplier exceed 1.15." It is obvious, however, that this statement was made in the context of Burlington's contention that the hourly rates sought by lead counsel should be reduced.

good or even excellent, this case cannot be regarded as an "exceptional success" as that term has been used by the Supreme Court of the United States. It points out that this was a settlement; the consent decree does not establish any legal precedent benefiting anyone outside of plaintiffs and the class; therefore, the relief granted was not exceptional in the sense of representing a landmark decision. Burlington asserts that while the $10,000,000 it paid into the fund is a large sum of money, the amount must be considered in light of the number of persons who will share in it and who total, according to lead counsel, as many as 20,000. Of these, a substantial portion will receive no money and of those 7,000 to 8,000 who will receive some monetary award, the average amount will be approximately $1,400 to $1,250.

As to the injunctive provisions of the decree, Burlington insists that none is unprecedented, unusual, or otherwise exceptional. The "fill rates" which lead counsel say make this case an exceptional one are not new and may not result in any increased employment of plaintiffs or members of the class; the "priority hiring" provisions about which petitioning counsel speak so highly actually provide the class with no benefits beyond that given them by the fill rates; and the transfer provisions are, in fact, less significant as relief devices than lead counsel believe. These details of the consent decree, according to Burlington, do not support the claim that in this case lead counsel have achieved that degree of "exceptional success" or that this is a "rare case" so as to justify the multiplier requested.

*Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) is the first opinion, as far as this court can ascertain, in which the Supreme Court of the United States, without defining the term, used the expression "exceptional success." There, the Court had before it the issue of whether in a civil rights suit a partially prevailing plaintiff may recover an attorney's fee for legal services rendered in pursuing unsuccessful claims. The Court held that the extent of a plaintiff's success is a crucial factor in determining the proper amount of an award of attorney's fees under 42 U.S.C. § 1988;[8] and that where a plaintiff achieved only limited success, a district court should award only that amount of fees that is reasonable in relation to the results obtained. *Hensley v. Eckerhart*, 461 U.S. at 436, 103 S.Ct. at 1941. In resolving the issue, the Court said, "Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee. Normally this will encompass all hours reasonably expended on the litigation, and indeed in some cases of exceptional success an enhanced award may be justified." *Id.* at 435, 103 S.Ct. at 1940.

Then, in *Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984), a 1978 suit filed on behalf of a statewide class of Medicaid recipients, the Court was called upon to decide under what circumstances an upward adjustment of an attorney's fees award based on prevailing market rates is appropriate under Section 1988. It ruled "that the 'product of reasonable hours times a reasonable rate' normally provides a 'reasonable' attorney's fee within the meaning of the statute." *Blum v. Stenson*, 104 S.Ct. at 1548. Referring to its opinion in *Hensley*, the Court said that decision "recognized that 'in some cases of exceptional success an enhanced award may be justified'." *Id.* at 1548. The burden is on the fee applicant to prove that in the relief obtained there has been "exceptional success." *Id.* at 1550. However, because this burden had not been discharged by Stenson, the Court held that it was an abuse of discretion for the district

---

**8.** In this case, the award of fees is sought under Section 2000e–5 of Title VII. It was held in *Doe v. Busbee*, 684 F.2d 1375, 1380 n. 3 (11th Cir. 1982), that:

Although the Title VII attorney's fees provision and § 1988 are separate and distinct statutory bases for awards of attorney's fees, both employ the "prevailing party" concept and both have received similar construction.

judge to give a 50 percent upward adjustment in the fee. *Id.*[9]

Again, as in *Hensley*, the Court neither explained nor defined "exceptional success" when used with regard to the relief obtained in a civil rights case. But this is not a technical term; it consists of words that have a common ordinary meaning and there is no reason to believe that the Court used them in any other way. Webster, always a reliable source for the meaning of English words, tells us that "exceptional", an adjective, means "forming an exception: being out of the ordinary: uncommon, rare...." Webster's *Third New International Dictionary* (G & C Merriam Co., 1966). Therefore, for success in a suit like this one to be exceptional, the relief obtained must be out of the ordinary, uncommon, or rare.

In this case, the complaints that McBride and Butler made to Charles Barnhill sometime in 1977 concerned their experiences as Negro employees of Burlington. There was nothing esoteric, complex, or unusual about what they must have told him. They wanted damages for what they said were injuries they suffered from being denied employment opportunities in the Burlington system and they wanted injunctive relief from the alleged race discriminatory policies and practices that infringed their rights as employees of the railroad. Investigation by Barnhill led him to conclude that the claims of the two men could be cast into a class suit.

As to the suit filed by Paul Sprenger for William Forbush, nothing in this record suggests that the complaint made to him was any different; the allegations in the suit filed in the United States District Court for Minnesota were like those made in this court for McBride and Butler. This is just as true of the other suits, the tagalongs and the cases consolidated with this one. The consent decree and the relief it gave McBride, Butler, Forbush, the other plaintiffs, and members of the class, conform to what was sought in the complaints. It gave plaintiffs and the class money, that is, $10,000,000 in settlement. This sum, though large, is not an unusual or an extraordinary amount to be shared by members of a class consisting of as many as 20,000 people, with 7,000 to 8,000 of them being allocated sums ranging from substantial to minimal.[10] In fact, as lead counsel know from cases they have handled, large, multi-million dollar sums are recovered in employment discrimination class suits.

For example, in *Elliott v. Sperry Rand Corp.*, 680 F.2d 1225 (8th Cir.1982), the sum involved $1.5 million as monetary relief for past discriminatory practices, the total class consisting of approximately 3,000 members. *Laffey v. Northwest Airlines, Inc.*, 746 F.2d 4 (D.D.C.1984), produced a $52 million recovery for a class "of more than 3,300 women employed by Northwest Airlines, Inc. ..." *Id.* at 7. *In re Southern Pacific Transportation Company Employment Practices Litigation*, MDL 262 (S.D.Tex.), was a settlement that created a $3 million fund for plaintiffs and the class. *Mays v. Motorola*, 18 EPD ¶ 8902 (N.D.Ill.1979), was settled before appeal for monetary and affirmative relief valued at $15 million. *Liberles v. County of Cook*, 709 F.2d 1122 (7th Cir.1983), a race discrimination class action, resulted in a money judgment in excess of $14 million, described by lead counsel as "the largest backpay judgment in the history of Title

**9.** It appears from the decided cases that the concept of enhancement of a lawyer's fee is referred to sometimes as "a bonus", as "a multiplier", or as "an upward adjustment". In *Blum v. Stenson*, 104 S.Ct. at 1547 n. 12, the Court said:

> The District Court characterized the 50% increase as a "bonus." The Court of Appeals, in its brief opinion, spoke of it as an "upward adjustment." As we think the latter characterization is fairer, we will use it.

This court will also use the expression "upward adjustment" but on occasion, to emphasize the point, it will also use the term "multiplier."

**10.** The named plaintiffs, a total of twenty-three persons, have been allocated sums ranging from $197,595 for McBride and Butler down to $35,000, the minimum given five of them. The class members have been allocated sums under $35,000 and as little as $100, a majority receiving less than $1,000 each.

VII." The cases vary in their details, but they show that large monetary relief in employment discrimination class suits, although not recovered as a matter of course, is not uncommon. *See generally 4 H. Newburg on Class Actions,* § 24.116 (2d ed. 1985).

Lead counsel insist, however, that the dollar value of the settlement fund is not the only measure of the success they achieved in this case. They say that the hiring, promotions and locomotive engineer training provisions of the consent decree have an economic value that make this case "an unprecedented settlement ...", one that "was the largest pretrial Title VII race settlement that had ever been achieved as of the time it was reached ...", that they "achieved an extraordinary result ...", an accomplishment that "was of an unprecedented character." Reply Brief of Lead Counsel at 5, 18, 20, 22. Lead counsel support these appraisals of their work with the affidavit of an expert in economics and with what they say is "a compendium of some of the [newspaper] stories generated by the BN settlement." Reply Brief of Lead Counsel at 23–24. They say that "[t]he BN settlement was one of the lead civil litigation stories of the year. It was reported on national television and scores of newspapers nationwide." Reply Brief of Lead Counsel at 23. Examination of the newspaper articles discloses that most of them reported the April 2, 1984 fairness hearing which this court held on the consent decree; and in a number of them there appeared the information that this case represented the largest civil rights settlement in United States history, the payment of $60.5 million in benefits to thousands of Negroes who had sued Burlington for alleged bias in personnel policies. Charles Barnhill, or a spokesperson for EEOC, was quoted as the source for this value of the settlement.

In reading these articles, the court is compelled to notice that the economic value of the consent decree has never been adjudicated in any proceeding in this case. On April 2, 1984 when the fairness hearing was held, lead counsel were present. Intervenor EEOC was represented by one of its staff lawyers; and Thompson Powers, the lawyer who had represented Burlington in negotiating the consent decree appeared for the railroad. The record shows that Barnhill made the first presentation in support of the consent decree. After a general review of the litigation, he said that an expert, one he and Sprenger had hired, "has valued this injunctive relief conservatively—and I mean conservatively—in excess of $50 million. In sum, the settlement is the largest pretrial settlement ever achieved in a racial discrimination case since the passage of Title VII." [11] Tr. 4/2/84 at 7. When Paul Sprenger spoke, he referred to the affidavit of the expert which expressed the opinion "that the economic benefit to the class of people that we are talking about here is about $60.5 million...." Tr. 4/2/84 at 12.

When Thompson Powers responded for the railroad, he reviewed his role in the negotiation process, referred to the estimates of the decree's value which Barnhill and Sprenger had made, and then said:

Plaintiffs are certainly entitled to their own estimate of what they have achieved, and except for its outcome on other stages of the proceeding, the company has little reason to challenge their estimates. But we must observe, as we have in our brief, that we think that their efforts to quantify the injunctive aspects of this decree are highly speculative, are extravagant, and in our judgment, may represent attorney fees puffery.

Tr. 4/2/84 at 33.

Powers made this statement a long time before the petitions for fees were filed by lead counsel; it was somewhat prophetic. The affidavit in support of the petitions is now a part of the record. A reading of it discloses it was prepared to support the representations made to this court and statements made to newspaper reporters by Barnhill and EEOC staff members after

---

**11.** This designation refers to the Transcript of Proceedings for April 2, 1984.

the fairness hearing. The expert swore to the affidavit on March 31, 1984 and after describing his relationship with lead counsel, he stated the conclusion "that there are substantial economic benefits to the class from the Consent Decree which will exceed $60 million." This evaluation included the cash, hiring, promotions and locomotive engineer training provisions of the consent decree. On September 8, 1984, the expert issued another affidavit in which he acknowledged a $3 million subtraction error, thus reducing his estimate to $57.5 million.

Burlington counters this opinion with one from an expert employed by its lawyers, and one who comes into the record through an affidavit that exudes exemplary academic qualifications. This expert devotes careful attention to the many errors he says were made by lead counsel's expert when he progressed to his conclusions concerning the economic value of the consent decree. The expert then comes to the conclusion that after weighing all the economic imponderables, the subtlety of the employment factors, the uncertainties of the speculative business possibilities of the future, and correcting the errors of lead counsel's expert, the economic value of the injunctive provisions of the consent decree could not be worth more than $6 million. Plainly, the views of these experts are in irreconcilable conflict. Of what value are they to this court in its resolution of the issue presented? Actually, very little.

First, there are serious questions concerning the accuracy of the calculations made by lead counsel's expert. As to both experts, they remind this court that it has been patiently waiting for the day when it will hear an expert give an opinion that does not slavishly parrot the case theory of the lawyer who employs him. Second, this court does not need the opinion of experts for it to grasp that the injunctive provisions of this consent decree has a money value; common sense, alone, makes this evident. Therefore, it will, as it may, "substitute its own common-sense judgment for that of the experts." *Webster v. Offshore Food Service, Inc.*, 434 F.2d 1191, 1193 (5th Cir.1970), and discount such testimony entirely. *United States v. Makris*, 535 F.2d 899, 908 (5th Cir.1976).

The court proceeds, then, on the assumption that the right to fill job vacancies as they occur in the relevant period, to priority hirings and promotions, and to opportunities for locomotive engineer training have an economic value, perhaps not as little as Burlington's expert claims and most likely not as much as lead counsel's expert contends. Contrary to lead counsel's arguments, this kind of relief is not extraordinary or uncommon in employment discrimination class suits. In fact, Section 706(g) of Title VII, 42 U.S.C., Sec. 2000e–5(g), provides that "[i]f the court finds ... [an employer] has intentionally engaged in or is intentionally engaging in an unlawful employment practice as charged in the complaint, ... [it may] enjoin the [employer] from engaging in such ... practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, ... or any other equitable relief as the court deems appropriate." Cases are common where such relief is granted, either in consent decrees or adjudicated judgments. *Cf. EEOC v. American Tel. & Tel. Co.*, 556 F.2d 167 (3d Cir.1977); *Officers for Justice v. Civil Service Comm'n, etc.*, 688 F.2d 615 (9th Cir.1982); *see also* B. Schlei and P. Grossman, *Employment Discrimination Law* 1395–1417 (2d ed. 1983), 1983 Supp. 168–172 (listing and discussion of the leading and current cases).

But while keeping in mind the size and extent of the relief which lead counsel obtained for their clients through the consent decree in this case, this court will follow the admonition that "judges determining fee awards should not be unduly influenced by the monetary size of the class settlement or judgment; a large settlement can as much reflect the number of potential class members or the scope of the defendant's past acts as it can indicate the prestige, skill, and vigor of the class's counsel." *City of Detroit v. Grinnell Corp.*, 560 F.2d 1093, 1099 (6th Cir.1977).

Of course, the size of the settlement is not the only feature of this case that should be considered in determining whether lead counsel are entitled to a fee enhancement or multiplier. Consistent with this notion, lead counsel argue that the risk they took in representing plaintiffs and the class were so great that unless their lodestar fees are subjected to an upward enhancement or multiplier, they will not receive the compensation to which they are entitled. They point to the testimony of witnesses as to their chances of recovery. Burlington, according to some of the testimony, "had a better than 50/50 chance to prevail"; other witnesses said that the "chance of [plaintiffs] prevailing was less than 50%." Based on these percentages, lead counsel argue that when they filed and pursued this litigation, they took the risk of not prevailing, and losing all they had put into it. They took the chance that there would be changes in the law, that they would be defeated by Burlington's litigation and settlement strategies, and that they may not have been able to continue financing the suits in the face of heavy costs and expenses. Despite these risks, lead counsel say they advanced more than $1 million to their clients and devoted thousands of attorney hours, all of which they would have lost had they not obtained the success they achieved in the case. Counsel strongly urge the point that unless they are granted the multiplier of 2.5 they request and thus are compensated fully, competent lawyers in Title VII cases will not take the responsibility of such litigation.[12]

Undoubtedly, this is a broad and sweeping argument. But the court must remind lead counsel that by the lodestar fees awarded them, they, their partners, associates, and paralegals, will receive the top hourly rate they have ever been paid by clients or awarded by a court, for every hour they have worked in this case, going back six years. In addition, lead counsel are being reimbursed, without any issue being raised concerning any item, all the money they have advanced toward the costs and expenses of litigation, a total of $1,131,929.19. Moreover, counsel are being paid at current rate, the top they can request, for hours worked during years they did not command that kind of compensation. The court has done this in order to compensate for the long delay in lead counsel's being paid a fee. It has kept uppermost in mind that when Congress enacted the fee-shifting provisions of Title VII, its purpose was "to ensure 'effective access to the judicial process' for persons with civil rights grievances," *Hensley v. Eckerhart*, 461 U.S. at 429, 103 S.Ct. at 1937 (quoting H.R.REP. NO. 94–1558 p. 1 (1976)), and that this court must award "fees which are adequate to attract competent counsel, but which do not produce windfalls for attorneys." *Blum v. Stenson*, 104 S.Ct. at 1546.

And as it must, the court has carefully and thoughtfully read the affidavits of the many distinguished members of the civil rights and Title VII bar obtained by lead counsel as evidence in these proceedings. It has listened, again carefully and thoughtfully, to the testimony of a distinguished lawyer of this community, one this court knows personally, and the testimony of a scholar, a former NAACP staff member with whom this court became acquainted in the days of the Civil Rights Movement in the 1950s and 1960s. It is unpleasant, even painful, for it to disagree with these witnesses but the court must. It must say it is just not true that unless lead counsel are given the 2.5 multiplier they request in this case, competent lawyers in Title VII cases will be discouraged from undertaking representation of persons with such civil rights grievances. Those who think so either do not know or remember the history of the struggle for equality under law in this country or they have no faith in the stamina and potential of American lawyers to come forward and vindicate, in the courts, the claims of those

---

12. This multiplier will increase the hourly rate at which Paul Sprenger will be paid to $450; and Barnhill's, to $425. On the average, all the lawyers will be paid $390.47 per hour. Neither Barnhill, Sprenger, nor any partner or associate can claim ever being paid at this hourly rate.

whose civil rights have been violated. In fact, these consolidated cases prove this point. So many lawyers, most of them advancing costs and expenses, were willing to represent complaining Negro employees of the railroad and so many suits were filed in different United States district courts against it, that Burlington had to seek relief from the Multi-District Litigation Panel.

■ The lodestar fees which this court has awarded lead counsel, their partners, associates, and paralegals, are presumptively the reasonable fees to which they are entitled. *Hensley v. Eckerhart,* 461 U.S. at 437, 103 S.Ct. at 1941. It is "the rare case in which an upward adjustment to the presumptively reasonable fee of rate times hours is appropriate." *Blum v. Stenson,* 104 S.Ct. at 1550 n. 18. There is heavy burden on attorneys for prevailing parties who seek to justify any upward adjustment; this burden is met only if there are specific claims based on particular factors and supported by specific evidence. *Thompson v. Barrett,* 599 F.Supp. 806, 815 (D.D.C.1984). If this burden is met, it is the duty of this court to state with particularity why an upward adjustment is necessary in order that the attorneys be adequately compensated. *Murray v. Weinberger,* 741 F.2d 1423, 1428 (D.C.Cir.1984); *Thompson v. Barrett,* 599 F.Supp. at 815.

Here, however, lead counsel have not met the required burden; they only refer in general terms to the chances the parties had of prevailing. Other than the general agreement among lead counsel's affiants about the difficulties of Title VII cases, there is no specific evidence in support. The fact is, every Title VII case, like civil cases generally, presents the chance of not prevailing. It seems to this court that lead counsel are confusing the difficulties of trial with risk, as that term is used in this area of the law. One need not be a specialist in the hazards of civil litigation to know that if the claims of individual plaintiffs are cast into a 20,000 member class suit against a viable, ongoing, solvent railroad corporation that does business in twenty

states, there are chances that plaintiffs will not prevail. Particularly is this true if the corporation is charged with race discrimination against its employees. Corporations, even when they are guilty, do not take lightly to charges that they commit wrongs against those they employ.

*Thompson v. Barrett,* 599 F.Supp. 806 (D.D.C.1984), cited by both parties to this controversy, is a good example of what is "exceptional success" in a civil rights case as that term was used in *Blum v. Stenson,* 104 S.Ct. at 1548. Therefore, the case is worth examining in some detail because its facts and the legal principles it represents aid this court in resolving the issue whether, in this case, lead counsel are entitled to an enhancement or multiplier of their lodestar fees.

In *Thompson,* five female employees in the bindery division of the Government Printing Office (GPO), on May 25, 1973, filed an administrative complaint on behalf of approximately 325 Journeyman Bindery Workers ("JBWs") employed by the GPO. They alleged Title VII and Equal Pay Act violations, and access violations under Title VII. They sought reclassification of all JBWs as Bookbinders, with pay commensurate with that reclassification. They also sought monetary and injunctive relief for what they alleged were illegal and discriminatory impediments to JBWs becoming Bookbinders. They lost the administrative proceedings, GPO finding that the females, and those on whose behalf they had filed the administrative complaint, were not victims of sex discrimination.

Then on July 24, 1974, a class suit was filed in the United States District Court for the District of Columbia. Again, as in the administrative complaint, plaintiffs relied, *inter alia,* on Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–16; the Equal Pay Act of 1963, as amended, 29 U.S.C. § 206(d); and Executive Order 11478, 34 C.F.R. 12985, as amended. Plaintiffs alleged a broad pattern and practice of discrimination on the part of GPO extending to all class of plaintiffs; they sought injunctive, declaratory,

and monetary relief, both prospective and retrospective.

When the case was filed, it was the first in that district to seek the use of quotas as a remedy for discrimination; it was one of the very few cases in the nation that challenged an established apprenticeship program; it was the first case to seek a determination that Equal Pay Act violations occur when males and females operated different machines; and it raised several important questions regarding the retroactive and prospective effect of Title VII and the Equal Pay Act. The case first went to trial before the judge to whom it was assigned and at the close of plaintiffs' case, he granted summary judgment in favor of the government on the Equal Pay Act claims. The case was then tried to a conclusion but no decision was rendered because the judge died before making the requisite findings under Title VII. The case was randomly assigned to another member of the court. That judge, after careful consideration, ruled that plaintiffs were entitled to a new trial on all issues and after discovery and pretrial proceedings, a second trial began on March 7, 1979. On October 1, 1979 a memorandum opinion on the issue of liability was issued. In it, the court held that Grade 4 JBW plaintiffs who operated Smyth Sewing Machines were entitled to relief under the Equal Pay Act, and that all plaintiffs were entitled to relief under Title VII on grounds, among others, that the four-year apprenticeship program was unnecessary and constituted a violation of Title VII as applied to the plaintiffs, and that the classification of all plaintiffs differently from Bookbinders also violated Title VII.

On May 20, 1980, a relief order was issued, together with a supporting memorandum which ruled that the plaintiffs were entitled to back-pay relief under the Equal Pay Act and Title VII, prior to the effective date of those statutes, that they were entitled to hiring preferences over males until fifty percent were women, and other prospective relief. The government appealed. On April 27, 1982, the Court of Appeals for the District of Columbia Circuit affirmed the trial court's decision in almost every respect. *Thompson v. Sawyer*, 678 F.2d 257 (D.C.Cir.1982). The court remanded for the narrow ground of refashioning the quotas or goals which the trial court had established and for revising the formula for front pay to make it consistent with the formula used for rewarding back pay for Title VII access violations. Although the government petitioned for an extension of time in which to file a petition for rehearing before the court of appeals, the motion was denied; GPO did not seek certiorari review by the Supreme Court. Then, the lawyer who had filed the case originally, and two others, petitioned for fees and costs through June 25, 1982. Request was made for two separate fifty percent upward adjustments to the lodestar amount, the first for exceptional risk involved in handling the case; the second for the exceptional results obtained.

The court first analyzed the claim of the lawyers that the risks involved justified an upward adjustment of the lodestar fees. After applying recent case law, decisions of the Supreme Court and of the circuit, and looking at the evidence presented in support of the request, the court found that plaintiffs had less than a nineteen percent chance of success. It reviewed the history of the case, the first trial and the adverse ruling on the Equal Pay Act claims, the success of the plaintiffs in the second trial, the appeal by the government, and the affirmance of the trial court in almost every respect. The court ruled that the lawyers had established grounds for a fifty percent upward adjustment of the lodestar fees for the risks involved in their handling the case.

Then it turned to the question whether the attorneys had met the burden regarding award of an upward adjustment for exceptional success. On this point, the court reviewed the results obtained. First, the monetary awards, for a class of 382 women, totalled more than $20 million; second, the "case resulted in many other improvements in the plaintiffs' workplace, including elimination of the 4-year appren-

**1064**

ticeship requirement for bookbinders and the opening of the door for women and other minorities to achieve supervisory status." *Thompson v. Barrett*, 599 F.Supp. at 816. The court noted that the case set precedents in many areas which were unclear when the suit was filed. It was the first one in the circuit to use quotas as a remedy for employment discrimination; it was one of the very few cases in the nation that successfully challenged an established apprenticeship program; it was the first case to hold that Equal Pay Act violations can occur when males and females operate different machines in the bookbinding industry; and the case resolved several important questions regarding retroactive and prospective effect of Title VII and Equal Pay Act provisions. The court went on to say that

> Even beyond this, the impact of this suit has affected the entire printing industry. Sex-segregated unions have merged together. The shock waves of this case have spurred inquiries and investigations into the work environment of all public and private printers. This was certainly an exceptional case, with far-reaching impact on the entire business or profession.

*Id.* The court awarded the prevailing attorneys a twenty-five percent upward adjustment to the lodestar fee for exceptional results. The fee as adjusted for the three lawyers, one of whom had been in the case for twelve years from the date of the original filing, their associates and paralegals, totaled $1,566,232.50. In summarizing the reasons for his ruling, the able and experienced district judge said, without equivocation, that "[i]n every respect, this case represents an outstanding example of tenacious advocacy, the making of new law, and doing so in the face of extreme odds

and in the finest tradition of legal advocacy at its very best." *Id.* at 808.

Nothing like this can be said of this case. It is not one that invoked any new theory of law; the risks were not as great; it did not create any new form of remedy for race discrimination victims in the area of employment; it did not establish any new rule of law; and in fact, the relief, in terms of money and employment opportunities, was spectacularly greater in *Thompson* than in the case at bar. Of course, lead counsel here deserve, and they are extended, the commendations of this court for the good work they have done and for that they are being paid reasonable and adequately compensatory fees.

The court is constrained to conclude, therefore, that this is not the kind of "exceptional success" that would entitle lead counsel being paid not only the lodestar fees awarded but in addition any multiplier as "an upward adjustment" for the legal work they have performed. They have not carried the burden of proof imposed on them by the cases; therefore, a multiplier, of any amount, would be improper. *McKinnon v. City of Berwyn*, 750 F.2d 1383 (7th Cir.1984); *Strama v. Peterson*, 689 F.2d 661 (7th Cir.1982); *see also Laffy v. Northwest Airlines, Inc.*, 746 F.2d 4 (D.C.Cir.1984); *cf. Jones v. Central Soya Co.*, 748 F.2d 586 (11th Cir.1984). On the evidence lead counsel have introduced, it would be an abuse of discretion for this court to grant an upward adjustment of the lodestar fees. *Blum v. Stenson*, 104 S.Ct. at 1550.

### D

Having thus concluded, and the amount of attorneys' fees and expenses having been determined,[13] the remaining issue is whether the thirteen union defendants[14] should be ordered to assume respon-

---

**13.** The amount to be paid lead counsel will include their claimed expenses. But since Burlington agrees that the amount of expenses shown in the petitions is fair, reasonable, was advanced by lead counsel, and that it will pay them, the court will not include the expenses in the order to be entered. This is without prejudice to lead counsel to apply for an order con-

cerning expenses, if, for some reason, this becomes necessary.

**14.** The unions who have been defendants in this case, and who joined in the consent decree are: (1) Brotherhood of Railway, Airline & Steamship Clerks, Freight Handlers, Express & Station Employees; (2) Brotherhood of Locomotive En-

sibility for some portion of the fees and expenses which are ordered paid to counsel for plaintiffs and the class. Burlington contends that this should be done because some of the fees and expenses are attributable to seniority issues on which plaintiffs are the prevailing parties. The unions do not agree; they contend that no portion of the fees and expenses should be their responsibility because (1) the applications for fees and expenses by lead counsel were not filed against them; (2) that under *Northwest Airlines v. Transport Workers Union*, 451 U.S. 77, 101 S.Ct. 1571, 67 L.Ed.2d 750 (1981), Burlington is not entitled to any contribution of fees and expenses from them; and (3) in any event, plaintiffs were not "prevailing parties" as to the unions.

These contentions require an examination of the consent decree, and particularly, the provisions relating to anticipated attorneys' fees and expenses. Article IX states, in part, that:

> BN will not dispute the entitlement of counsel for private plaintiffs and EEOC to reasonable costs, including (except as to EEOC) reasonable attorneys' fees, as provided [in the consent decree], on any issue but may seek apportionment of those costs and fees among all defendants or contribution from the unions for allocable portion of those costs and fees.
>
> The defendant unions do not agree that private plaintiffs and EEOC are entitled to any costs and fees from them. The defendant unions may make whatever objections they deem appropriate to the private plaintiffs' and the EEOC's petition as well as to any effort by BN to secure apportionment of contribution for an allocable portion of those costs and fees.

An addendum to the decree, agreed to by the unions, in part provides:

Plaintiffs' counsel will seek costs and fees with respect to the hiring and discipline/discharge issues, including claims as defined in paragraph II.B.2 (page 4) of the Decree, from BN only. As provided in Part IX of the Decree, BN does not dispute the entitlement of counsel for private plaintiffs and EEOC to reasonable costs as determined under Part IX, including (except as to EEOC) reasonable attorneys' fees, as to those issues. BN will not seek apportionment of or contribution towards the costs and fees relating to the issues specified in this paragraph from the unions.

Clearly, under these provisions, it was contemplated that fees and expenses would be sought from Burlington; that the railroad would then seek apportionment among and contribution from the unions; and that the unions preserved the right to object to any apportionment or contribution. Therefore, the procedure used here, namely, lead counsel seeking their fees and expenses from Burlington with the railroad seeking allocation among the unions, is as provided for by Article IX and the addendum to the consent decree. For these reasons, lead counsels' filing their petitions only against Burlington does not prevent the unions from being ordered to assume some responsibility for the fees and expenses of this case.

The unions' reliance on *Northwest Airlines v. Transport Workers Union*, 451 U.S. 77, 101 S.Ct. 1571, 67 L.Ed.2d 750 (1981) is misplaced; the facts there are clearly distinguishable from the ones at bar. *Northwest Airlines* is a case in which an employer was found liable for violations of Title VII and brought suit against a union representing its employees, seeking contribution for money damages the employer was required to pay in Title VII

gineers; (3) Railroad Yardmasters of America; (4) Brotherhood of Maintenance of Way Employees, AFL–CIO; (5) Brotherhood of Railway Carmen of the United States and Canada, AFL–CIO; (6) International Association of Machinists & Aerospace Workers; (7) International Association of Boilermakers, Iron Shipbuilders, Blacksmiths, Forgers & Helpers, AFL–CIO; (8) Inter-

national Brotherhood of Electrical Workers, AFL–CIO; (9) International Brotherhood of Firemen & Oilers, AFL–CIO; (10) Sheet Metal Workers International Association, AFL–CIO; (11) American Train Dispatchers Association, AFL–CIO; (12) United Transportation Union, AFL–CIO; (13) Brotherhood of Railroad Signalmen, AFL–CIO.

damages. The union was not a defendant in the underlying litigation. The Supreme Court held that an employer cannot maintain an action for contribution toward Title VII damages against a union which was not a defendant in the suit that resulted in a money award against the employer. This case is different. Burlington is not seeking contribution from non-party unions toward damages it has agreed to pay; it seeks an allocation of attorneys' fees and expenses it must pay lead counsel for plaintiffs and the class. And, more importantly, the unions are, and have been for years, defendants in this litigation; the question of attorneys' fees and expenses is all part of the suit in which the unions have participated.

As was noted in *Northwest Airlines*, a district court has broad power under Section 706(g), 42 U.S.C. Section 20002–5(g) to fashion relief against all defendants in a Title VII action. 451 U.S. at 93 n. 28. These defendants being unions does not immunize them from their obligation, imposed by statute, to pay reasonable attorneys' fees and costs to a prevailing plaintiff. Numerous reported decisions have allocated attorneys' fees awards among employer and union defendants. *See, e.g., Sagers v. Yellow Freight Systems*, 529 F.2d 721 (5th Cir.1976); *Barnett v. W.T. Grant Co.*, 518 F.2d 543 (4th Cir.1975); *Rogers v. International Paper Co.*, 510 F.2d 1340 (8th Cir.1975); *Johnson v. Goodyear Tire & Rubber Co.*, 491 F.2d 1364 (5th Cir.1974); *Vulcan Society v. Fire Dep't of White Plains*, 533 F.Supp. 1054 (S.D.N.Y. 1982); *Walker v. Ralston Purina Co.*, 409 F.Supp. 101 (M.D.Ga.1976) and *Hairston v. McLean Trucking Co.*, 62 F.R.D. 642 (M.D. N.C.1974). In all of these cases, union defendants were held responsible for portions of attorneys' fees and costs. This being a Title VII action, the union defendants in this case are similarly responsible for allocable portions of attorney fees and expenses, if they were prevailed against by plaintiffs.

Some of the unions contend, however, that plaintiffs are not "prevailing parties" as to them. For example, the Brotherhood of Railway and Airline Clerks (BRAC), has

presented evidence to the effect that on November 6, 1975, it signed an agreement with the National Railway Labor Conference, consisting of all United States Class I Trunk Rail Carriers, including Burlington, which gave Negro employees a special opportunity to transfer from a BRAC craft to any other craft, if permitted by the employer-carrier. In such transfers, Negro transferees retained fallback seniority and any employee transferring into a BRAC class or craft would bring with him or her all previous seniority. BRAC claims that these transfer provisions were equal or superior to the relief obtained by the consent decree and that signing it was a gratuity on BRAC's part, thus resulting in plaintiffs not being prevailing parties. United Transportation Union (UTU), contends that the special transfer provisions of the consent decree do not affect its practices or benefit its members; therefore, plaintiffs also are not prevailing parties against it.

It is axiomatic that a plaintiff must be a "prevailing party" in order to recover attorneys' fees and costs in a civil rights suit, the standard for making this threshold termination being that "plaintiffs may be considered 'prevailing parties' for attorneys' fees purposes if they succeed on any significant issue in litigation which achieves some of the benefits the parties sought in bringing suit." *Hensley v. Eckerhart*, 461 U.S. at 433, 103 S.Ct. at 1939 (quoting *Nadeau v. Helgemoe*, 581 F.2d 275, 278–79 (1st Cir.1978)). This standard has been said by the Supreme Court to be "a generous formulation." *Id.*

It is well established that the consent decree in this case is a contract enforceable against all the parties to it. *Dunaway v. Storm*, 334 N.E.2d 825, 829, 30 Ill.App.3d 880 (5th Dist.1975); *cf. Dotson v. United States Department of Housing & Urban Development*, 731 F.2d 313, 318 (6th Cir. 1984). This includes the unions; they were defendants to the suit, they participated in negotiating the decree, and they signed it. The special transfer provisions require the unions to modify their procedures and practices with respect to fallback seniority and

while this relief is less than what plaintiffs initially sued for, it "achieves some of the benefits [they] sought in bringing suit." It is true that this case was not the "exceptional success" which entitle lead counsel to an upward adjustment of their lodestar fees but the results obtained against the unions were still significant enough to support the conclusion that plaintiffs have prevailed against them.

With regard to BRAC's prior transfer agreement, a reading of it reveals it did not apply to Negro employees hired by Burlington after August 31, 1971, while members of the class in this suit include Negro employees hired after that date; therefore, the consent decree requires BRAC to change its seniority practices with respect to such employees. Similarly, while the special transfer provisions of the consent decree may not affect members of United Transportation Union directly, they can be used by members who began work before 1978 in a non-UTU job. In such a case, UTU will have to modify its seniority retention provisions as to those members of the class in this suit.

Nor is there merit to the position of the unions that they were merely nominal defendants in this suit, and, therefore, are in no way responsible for any portion of the fees and expenses which Burlington must pay to lead counsel. They were active throughout this civil action. They conducted discovery, objected to discovery requests, and made a number of motions, including one by BRAC and UTU with supporting memoranda urging grant of Burlington's motion to redefine the class, one denied by this court and described by lead counsel as a critical ruling in this litigation. While it is true that Burlington was the principal defendant, the unions were more than just nominal ones. It is also true that plaintiffs were significantly more successful in the relief obtained against Burlington; still, they obtained enough success against the unions to be considered "prevailing parties" as to them. Accordingly, the court concludes that the thirteen union defendants should assume responsibility for a portion of the fees and expenses of this case. The remaining question is what should be that portion.

The consent decree provides that Burlington is to bear full responsibility for all fees and expenses related to litigating issues concerning hiring, discipline, and discharge. The parties agree that if any allocation is made, the unions should be responsible only for a portion of the fees and expenses attributable to seniority-related issues. In its post-hearing memorandum, Burlington proposes that the unions pay one-half of the fees and expenses which, based on lead counsel's records, are clearly attributable to seniority-related issues. It contends that this division would understate the union's fair share of the fees and expenses, and that an additional allocation of ten percent of the sums not clearly attributable to seniority-related issues should also be paid by the unions. Its reasons for this additional allocation are three-fold. First, though generally detailed, not all of lead counsel's expense and fee entries provide enough information to determine whether seniority-related issues are involved. Second, some items have application to many issues; for example, lead counsel incurred substantial expense for statistical analysis of Burlington's workforce, and some of that analysis surely related to senority issues. Third, there were many activities in this litigation, like attendance at status calls, which concerned the entire case, not only Burlington.

This court, on review of Burlington's proposal, finds merit in the suggested allocation. Fifty percent of the fees and expenses clearly attributable to seniority-related issues appears to the court to be an accurate, fair, and equitable allocation. The court also agrees that ten percent of the fees and expenses not clearly attributable to seniority-related issues should be allocated to the unions. As is the case in any litigation involving multiple defendants, portions of the time spent by lead counsel, such as attendance at status calls, is attributable to all issues in the suit, and some of the expenses borne by plaintiffs' counsel have application to all defendants.

With respect to the actual allocations, it appears that one attorney, Bridget Arimond of the Barnhill firm, was assigned the task of preparing plaintiffs' case on the seniority-related issues.. Therefore, fifty percent of her fees should be allocated to the unions. As to the remaining attorneys with both firms, the record does not clearly disclose what portions of their hours were related to the subject of seniority; for this reason, a straight ten percent of their fees should be allocated to the unions. A review of the expenses does not disclose which are clearly attributable to the subject of seniority; therefore, ten percent of the expenses should be allocated to the unions. Based on this formulation, the lodestar fees and expenses are apportioned between Burlington and the unions as follows.

FEES

| Attorney | Lodestar Fees | BN's Share* | Unions' Share* |
|---|---|---|---|
| Paul C. Sprenger | $580,005.00 | $522,004.50 | $ 58,000.50 |
| Eric L. Olson | 193,040.00 | 173,736.00 | 19,304.00 |
| Robert L. Shutes | 516,360.00 | 464,724.00 | 51,636.00 |
| SO&S Paralegals | 143,480.00 | 129,132.00 | 14,348.00 |
| Subtotal: | $1,432,885.00 | $1,289,596.50 | $143,288.50 |
| Charles Barnhill | $496,145.00 | $446,530.50 | $ 49,614.50 |
| Judson S. Miner | 16,575.00 | 14,917.50 | 1,657.50 |
| George F. Galland | 850.00 | 765.00 | 85.00 |
| Briget Arimond** | 139,425.00 | 69,712.50 | 69,712.50 |
| Nancy J. Anderson | 28,687.50 | 25,818.75 | 2,868.75 |
| Paul Strauss | 6,764.00 | 6,083.60 | 676.40 |
| DMB&G Paralegals | 62,834.00 | 56,550.60 | 6,283.40 |
| Subtotal: | $751,280.50 | $620,382.45 | $130,898.05 |
| Total: | $2,184,165.50 | $1,909,978.95 | $274,186.55 |

\* Allocated 90% to BN and 10% to the unions, with the exception of the fees of Briget Arimond.

\*\* Briget Arimond's fees are allocated 50% to BN and 50% to the unions.

EXPENSES

| Attorney | Actual Expenses | BN's Share* | Union's Share* |
|---|---|---|---|
| Paul C. Sprenger | $763,852.95 | $687,467.65 | $76,385.30 |
| Charles Barnhill | 206,672.15 | 186,004.94 | 20,667.21 |
| Total: | $970,525.10 | $873,472.59 | $97,052.51 |

\* Allocated 90% to BN and 10% to the unions.

## IV

For the reasons stated, lead counsel, their partners, associates, and paralegals, are awarded lodestar fees totaling $2,184,-165.50 to be paid to them by Burlington. This court finds this sum is reasonable. Of this total sum, Paul C. Sprenger shall be paid $1,432,885.00 from which he shall pay his partners and the paralegals of his firm in the amounts shown at the end of Part III–A, page 28 of this memorandum, if they have not already been paid. Charles Barnhill or Judson S. Miner is entitled to receive $751,280.50, from which sum, his partners, associates, and the paralegals of his firm shall be paid the amounts shown at the end of Part III–A, page 28 of this memorandum, if they have not already been paid. In addition, as Burlington has agreed, lead counsel are to be reimbursed their advanced expenses totaling $1,131,929.19: $925,257.04 to Sprenger, and $206,672.15 to Barnhill or Miner.

The unions' share of the fees and expenses being paid by Burlington to lead counsel is $371,239.06. Of the fees paid to Sprenger, $143,288.50 is allocated to the unions and of the sum paid to Barnhill or Miner, $130,898.05. Of the expenses paid to Sprenger, the unions are allocated $76,-385.30 and of the expenses paid to Barnhill or Miner, the unions shall pay $20,667.21. The thirteen union defendants shall pay the share of fees and expenses allocated to them equally, so that each will pay to Burlington the sum of $28,556.85 which is 1/13th of the allocated share.

Within ten days of the date of the applicable order entered pursuant to this memorandum, the unions shall each pay to Burlington their apportioned share of the allocated fees and expenses. If, at the end of the ten-day period, such payment has not been made, then Burlington may move the court for entry of a judgment, jointly and severally, against all of the unions who have not paid their portion of the allocated fees and expenses, unless the parties shall have agreed to an extension of the ten-day period. If such judgment is entered, execution shall follow as by statute and laws provided. Appropriate judgment orders, in accordance with the findings and conclusions contained in this memorandum, will

issue, conforming with the provisions of Rule 58(1), Fed.R.Civ.P.